John AARON et al., Plaintiffs,

v.

William G. COOPER et al., Members of the Board of Directors of the Little Rock, Arkansas Independent School District, and Virgil T. Blossom, Superintendent of Schools, Defendants.

No. 3113.

United States District Court
E. D. Arkansas, W. D.
June 20, 1958.

On Plaintiffs' Motion for Supersedeas
June 23, 1958.

See also 156 F.Supp. 220.

Thurgood Marshall, New York City, Wiley A. Branton, Pine Bluff, Ark., and U. Simpson Tate, Dallas, Tex., for plaintiffs-respondents.

A. F. House and R. C. Butler, Little Rock, Ark., for defendants-petitioners.

LEMLEY, District Judge.

This cause is now before the Court upon the petition of the defendants, members of the School Board of Little Rock, Arkansas, and the Superintendent of Schools, for an order permitting them to suspend until January, 1961, the operation of the plan of gradual racial integration in the Little Rock public schools, which plan was adopted by the Board in 1955, and was approved by the Court in 1956, the Court of Appeals affirming. Aaron v. Cooper, D.C.Ark., 143 F.Supp. 855, affirmed 8 Cir., 243 F.2d 361. This petition has been tried to the Court and the Court having considered the pleadings, briefs and evidence, and being well and fully advised, doth file this memorandum opinion, incorporating herein its findings of fact and conclusions of law.

In order that the issues tendered by the Board's petition may be intelligently understood, a brief history of this litigation is desirable:

Prior to the decisions of the Supreme Court of the United States in the Brown cases (Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed.

1083) the public school system in Little Rock, like all other public school systems in the State of Arkansas, was operated on a racially segregated basis. A few days after the first Brown decision was rendered the Board announced that it was commencing studies looking toward the establishment of an integrated school system; and in 1955, a few days prior to the rendition of the second Brown decision, the Board announced a plan of gradual integration extending over a period of years, the plan to go into operation with respect to the high school grades at the commencement of the 1957–58 school year.[1]

Thereafter, the plaintiffs in this case, who are Negro children of school age residing within the Little Rock School District, commenced a class action against the members of the Board and the Superintendent of Schools attacking the plan. The case was tried by Judge John E. Miller of Ft. Smith, who was sitting in the Eastern District of Arkansas under a special assignment. As indicated, the plan was approved, and the Court dismissed the prayer of the complaint for declaratory and injunctive relief, and retained jurisdiction of the case for the purpose of entering such other and further orders as might be necessary to obtain the plan's effectuation.[2]

At the time the plan was adopted, the Board recognized that the vast majority of the people of Little Rock was opposed to integration, but it was felt by the Board that the plan would be acceptable as the best one obtainable under the circumstances, and that it would be workable if put into operation in September, 1957. As time went on, however, opposition to integration increased in intensity not only in Little Rock but throughout the State as a whole, as is shown by the fact that in the general election in November, 1956, the people of the State by substantial majorities adopted: (a) Amendment No. 44 to the Arkansas Constitution of 1874, which amendment directed the Arkansas Legislature to take appropriate action and pass laws opposing "in every Constitutional manner" the decisions of the Supreme Court in the Brown cases; (b) A resolution of interposition which, among other things, called upon the people of the United States and the governments of all of the separate states to join the people of Arkansas in securing the adoption of an amendment to the Constitution of the United States, which would provide that the powers of the federal government should not be construed to extend to the regulation of the public schools of any state, or to include a prohibition to any state to provide for the maintenance of racially separate but substantially equal public schools within such state; (c) A pupil assignment law dealing with the assignment of individual pupils to individual public schools.

And the 61st General Assembly, which met in January, 1957, passed four statutes, one of which established a State Sovereignty Commission; another of which relieved school children of compulsory attendance in racially mixed public schools; the third of which required certain persons and organizations engaged in certain activities, including those affecting integration, to register with and make periodic reports to the State Sovereignty Commission; and the fourth of which authorized local school boards to expend district funds in employing counsel to assist them in the solution of problems arising out of integration.

In August, 1957, Mrs. Clyde Thomason, a white person, filed a suit against the Board and the Superintendent in the

---

1. The plan is set out verbatim and thoroughly discussed in the district court's opinion in Aaron v. Cooper, supra.

2. In the very recent case of Thomason v. Cooper, 8 Cir., 254 F.2d 808, a phase of this litigation, as will hereinafter appear, the Court of Appeals in construing Judge Miller's decree, said that in effect it ordered the Board to put the plan into operation at the beginning of the 1957–58 school year.

Chancery Court of Pulaski County, the purpose of which suit was to enjoin them from putting the plan into operation; that suit was based, in part at least, upon the legislation heretofore mentioned. A hearing was held before the Chancellor, and on August 29, 1957, a temporary restraining order was issued. At that time Judge Ronald N. Davies of Fargo, North Dakota, was sitting in the Eastern District of Arkansas under special assignment, and on August 30, upon the application of the Board in this cause, he enjoined further proceedings by the plaintiff in the state court litigation. His decision was appealed, and he was affirmed. Thomason v. Cooper, supra.

The 1957–58 school year was due to commence on September 3, 1957, and the Board had arranged to enroll nine Negro students in the formerly all-white Central High School pursuant to the plan. On the night of September 2, however, the Governor of the State of Arkansas announced that in the interest of preserving the public peace and tranquility he had called out units of the Arkansas National Guard and had directed that the white schools be placed "off limits" to Negro students, and that the Negro schools be placed "off limits" to white students. The Board, learning of the Governor's action, requested the nine Negro students not to attempt to enter the school the following day, and on the morning of September 3 the Board applied to Judge Davies for instructions. As a result of that application Judge Davies entered an order on the same day directing the Board to put its plan of integration into operation "forthwith."

On September 4 the Negro students attempted to enter the school but were turned away by the national guardsmen. The next day the Board filed a petition for a temporary suspension of the operation of the plan, which petition upon a hearing by Judge Davies was denied.

On September 9, 1957, Judge Davies entered an order inviting the Government to come into the case as amicus curiae and to commence injunction proceedings against the Governor and his subordinates "to prevent the existing interferences with and obstructions to the carrying out of the orders heretofore entered by this Court in this case." Thereupon the Government intervened, and after a hearing held on September 20, a preliminary injunction was entered restraining the Governor, the Adjutant General of the State of Arkansas, and the Unit Commander of the guardsmen on duty from "(a) obstructing or preventing, by means of the Arkansas National Guard; or otherwise, Negro students eligible under said plan of school integration to attend the Little Rock Central High School, from attending said school or (b) from threatening or coercing said students not to attend said school or (c) from obstructing or interfering in any way with the carrying out and effectuation of this Court's orders of August 28, 1956 and September 3, 1957, in this case, or (d) from otherwise obstructing or interfering with the constitutional right of said Negro children to attend said school." See Aaron v. Cooper, D.C.Ark., 156 F. Supp. 220.

The Governor obeyed the order entering the temporary injunction just mentioned, while at the same time prosecuting an appeal therefrom, and withdrew the national guardsmen. Judge Davies' decision in question was affirmed by the Court of Appeals on April 28 of the current year. Faubus v. United States, 8 Cir., 254 F.2d 797. On Monday, September 23, the Negro students entered Central High School under the protection of the police department of the City of Little Rock and of certain members of the Arkansas State Police. A large and demonstrating crowd, however, had gathered around Central High School, which crowd the officers on duty could hardly control, and they advised the Superintendent to remove the Negro children from the school which was done.

A short time later the Negro students were readmitted to the school under the protection of combat troops of the regular United States Army which the

President sent into Little Rock for that purpose, and eight of these students remained enrolled for the balance of the school year which closed on May 28, 1958. During the entire school year the grounds and interior of Central High School were patrolled first by regular army troops and later by federalized national guardsmen.

The petition for a stay with which we are concerned was originally filed by the Board on February 20, 1958; that pleading, reduced to essentials, alleged that federalized national guardsmen were on duty at the school and were preventing interference with the attendance of the Negro students, that a small group of students with the encouragement of certain adults had created almost daily incidents making it difficult for pupils to learn and teachers to teach, that there existed unrest among students, parents and teachers which likewise made it difficult for the school district to maintain a satisfactory educational program, and that educational standards were being impaired. The prayer of the original petition was that "the plan of integration heretofore ordered by this Court be realistically reconsidered in the light of existing conditions and that in the interest of all pupils the beginning date of integration be postponed until such time as the concept of 'all deliberate speed' can be clearly defined and effective legal procedures can be obtained which will enable the District to integrate without impairment of the quality of education it is capable of providing under normal conditions." On February 25, 1958, the plaintiffs filed a motion to dismiss the petition on the ground that it stated no claim upon which relief could be granted, and on the further ground that it stated no claim for relief from a judgment or order cognizable under Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Although this case had never been on our docket, due to the fact that at the time there was no other judge regularly commissioned in the Eastern District of Arkansas, and in view of the public interest involved in the Board's petition, the Honorable Archibald K. Gardner, Chief Judge of the Court of Appeals for this Circuit, on April 18, 1958, designated us to hear and determine the issues presented by the petition, "and to do such work as may be necessary and incidental to acting upon said petition." This special assignment was made to run from April 21, 1958, to September 1, 1958, both dates inclusive.

On April 28, 1958, we held a preliminary proceeding in this matter, in the course of which we read a prepared statement, which, among other things, directed that the original petition be amended so as to disclose whether the Board desired time to reconsider the plan, or whether it simply wanted a "moratorium" or a "cooling off period," and also so as to give a reasonable indication of how long a postponement the Board felt that it needed at this time.

Subsequently, the Board filed a substituted petition containing allegations more or less similar to those of its original pleading, and praying that a stay be granted until January, 1961. In that connection, it was alleged: "Petitioners cannot with certainty determine how long operations under the plan should be postponed, but in the light of existing conditions hereinabove mentioned and in the light of conditions as they will probably exist in the foreseeable future, they are of the opinion that a suspension of operations under the plan until January, 1961 is reasonable and advisable."

The plaintiffs filed a response to the substituted petition wherein they renewed their motion to dismiss, on which motion ruling had been reserved at the preliminary proceeding above referred to, and in which they denied that the Board is entitled to the relief sought. In addition, on behalf of the Negro students admitted to the school in September, 1957, it was alleged that their rights to finish their high school education in Central High School have become vested, and that "defendants are without right at law or equity to frustrate said vested rights in this or any other proceeding."

When this matter was called for trial on the morning of June 3, the Board, without objection on the part of the plaintiffs, filed an amendment to the substituted petition alleging more definitely the respects in which it contends that the educational program at Central High School has been impaired due to the alleged situation at Little Rock. It is said in the amendment that the educational program has suffered and will continue to suffer; that the Board has had to divert funds in an attempt to solve the problems with which it has been faced, which funds would otherwise have been used for normal educational purposes such as teachers' salaries, plant maintenance and new construction; that under the conditions that existed at Central High School during the school year just past, and under the conditions likely to exist in the foreseeable future, both the Negro and the white students have suffered and will continue to suffer unless the requested delay is granted; and that the problems caused by operation under the court orders that have been mentioned have taken and will continue to take "an undue amount of time, talent and energy of school personnel, all of which has been and will continue to be a severe strain on said personnel, and which has prevented and will continue to prevent said personnel from performing many of their regular duties."

While the plaintiffs have not filed any formal pleading directed at the amendment to the substituted petition, we shall treat the amendment as traversed, and will also consider that the plaintiffs' motion to dismiss extends to the same, as well as to the other pleadings filed by the Board.

It is the theory of the Board, reflected in its pleadings, evidence and briefs, that the plan of integration which it adopted in 1955, upon the assumption that it would be acceptable and workable, has broken down under the pressure of public opposition, which opposition has manifested itself in a number of ways hereinafter mentioned, and that as a result the educational program at Central High School has been seriously impaired, that there will be no change in conditions between now and the time that school opens again in September, 1958, and that if the prayer for relief is not granted the situation with which the Board will be confronted in September will be as bad as, if not worse than the one under which it has labored during the past school year, and that it is in the public interest that the requested delay be granted.

While the plaintiffs deny, at least formally, that the educational standards at Central High School have been impaired, it seems to us that their fundamental position is, that even if it be assumed that everything that the Board alleges is true from a factual standpoint, nevertheless the Board's difficulties stem entirely from popular disagreement with the principle of integration, which disagreement does not form a proper legal basis for permitting the Board to postpone the operation of its plan. This contention is summarized in the plaintiffs' pre-trial brief in the following language: "The defendants' case for suspension of the injunctions is predicated upon problems allegedly created by community oppositions to continued nonsegregation at Central High School. Such an approach is without legal foundation."

In addition, the plaintiffs contend that the Board does not actually stand in need of any relief. As touching the situation inside the school, they urge that the Board could have solved its problems during the year just past had it taken a firmer disciplinary stand, and that if such a stand is taken this fall the problems can still be solved; and they contend still further that if a stay should be granted it will be more difficult to put the plan back into effect in 1961 than it would be for the Board to persevere with it this coming year. With regard to the situation outside the school, the plaintiffs argue that the Board's proper remedy is the commencement of criminal proceedings or the seeking of injunctive relief against the persons responsible for the disorders.

Those conflicting theories present two basic questions for our decision, namely, whether or not this Court, sitting as a court of equity, has the power to grant the relief sought, and, if so, whether or not the Board has made a showing sufficient to justify the granting of that relief. In that connection we might call attention to the fact that in the prepared statement that we read at the preliminary proceeding held on April 28 we took occasion to say, among other things: " * * * let me make it clear that if the Board makes a case for relief under the law and the evidence, then appropriate relief will be granted. But, on the other hand, if the Board fails to make a case, either from a legal or a factual standpoint, its petition will have to be denied."

As to the first question, there can be no doubt that this Court has "jurisdiction," in the sense of "power to act," to grant the relief sought. Such power is to be found in Rule 60(b) (5) and (6) authorizing a federal court to grant relief from a judgment when it is no longer equitable for the same to have prospective application, or for "any other reason justifying relief from the operation of the judgment"; and in their response to the substituted petition the plaintiffs admit: " * * * that Rule 60(b) (5) and (6) empowers the Court to grant, upon such terms as are just, relief from a judgment or order."

Aside from Rule 60(b), jurisdiction to grant relief here may be predicated upon the inherent power of a court of equity with respect to its injunctive decrees. United States v. Swift & Co., 286 U.S. 106, 114–115, 52 S.Ct. 460, 76 L.Ed. 999; United States v. Little Rock Packing Co., D.C.Ark., 104 F.Supp. 527; Tobin v. Little Rock Packing Co., affirmed 8 Cir., 202 F.2d 234, certiorari denied 346 U.S. 832, 74 S.Ct. 26, 98 L.Ed. 355. And, more cogently, the existence of such jurisdiction in a case of this kind appears to have been specifically recognized in the second Brown opinion wherein it was said:

"In fashioning *and effectuating* the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a *practical flexibility* in shaping its remedies and *by a facility for adjusting and reconciling public and private needs.* These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call, for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884]. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

"While giving weight to these public and private considerations, the courts will require that the defendants make *a prompt and reasonable start* toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts *may find that additional time is necessary to carry out the ruling in an effective manner.* The burden rests upon the defendants to establish that such time *is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date.* * * *" Brown v. Board of Education, supra, 349 U.S. at page 300, 75 S.Ct. at page 756, emphasis supplied.

To hold that once a plan of integration has been approved and ordered into effect by a federal court, all of the details of that plan, including the commencing date and the rate of progress toward complete elimination of compulsory segregation, become immutably fixed would negate the concept of equity's "practical flexibility" in shaping its remedies, and would be an unwarranted limitation upon its "facility for adjusting and reconciling public and private needs." And it should be noted in this connection that although in the Arlington County, Virginia case the district judge ordered the Board there involved to commence integration by a certain time and to complete it by a certain time, he expressly reserved the power "to enlarge, reduce, or otherwise modify the provisions of said injunction or of this decree." Thompson v. County School Board of Arlington County, Va., D.C.Va., 144 F.Supp. 239, 241, affirmed School Board of City of Charlottesville, Va., v. Allen, 4 Cir., 240 F.2d 59, certiorari denied County School Board of Arlington County, Va., v. Thompson, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664.

▊ As we approach the second question in this case, it should first be said that it cannot be seriously contended that the Board did not make a "prompt and reasonable start" toward a transition from a racially segregated to a racially integrated public school system. As stated, the Board announced its intention to move in that direction a very few days after the first Brown decision, and it actually announced its plan some days before the second and implementing decision in that litigation; and, in spite of the difficulties that have been outlined, it put the plan into operation and maintained it during the past school year. Hence the real problem is whether or not the Board now needs more time to make the transition "in an effective manner," and whether or not the granting of such time "is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date."

At the hearing on the petition, which extended from June 3 into the afternoon of June 5, the Board called to the stand its president, Mr. Wayne Upton, its Superintendent of Schools, Mr. Virgil T. Blossom, certain members of the administrative staff of the high school, and certain class-room teachers. While the attorneys for the plaintiffs diligently cross-examined the main witnesses called by the Board, they did not put on any proof of their own tending to contradict the factual aspects of the testimony of the Board's witnesses, but confined their evidence to the testimony of two expert witnesses, namely, Dr. Virgil M. Rogers, Dean of the School of Education of Syracuse University, Syracuse, New York, and Dr. David G. Salten, Superintendent of Schools at Long Beach, Long Island, New York. Those witnesses gave it as their opinion in general that to grant the petition would be unnecessary and undesirable, and that the Board should keep its plan in operation while using stricter disciplinary procedures against those in the school who might become involved in racial incidents such as were described by the Board's witnesses; and they also were of the opinion that stricter procedures should have been used during the past school session.

From the practically undisputed testimony of the Board's witnesses we find that although the continued attendance of the Negro students at Central High School was achieved throughout the 1957–58 school year by the physical presence of federal troops, including federalized national guardsmen, nevertheless on account of popular opposition to integration the year was marked by repeated incidents of more or less serious violence directed against the Negro students and their property, by numerous bomb threats directed at the school, by a number of nuisance fires started inside the school, by desecration of school property, and by the circulation of cards, leaflets and circulars designed to intensify opposition to integration. Mr. J. O. Powell, the vice-principal for boys at the high school, summed the situation up by say-

ing that the first year of operation under the plan was one of "chaos, bedlam and turmoil" from the beginning.

The incidents and other matters just referred to, plus the presence of the troops, which was in and of itself a distracting influence, created throughout the year a situation of tension and unrest among the school administrators, the class-room teachers, the pupils, and the latters' parents, which inevitably had an adverse effect upon the educational program; and we find that said program was seriously impaired, that the orderly administration of the school was practically disrupted, and that educational standards have suffered. We further find that unless a stay is granted, the same situation will prevail when school opens in September, and that the impairment of the educational program and standards will continue, and will probably grow worse.

Before discussing further the adverse effect of the events that transpired during the past school year, we desire to point out that the Board and the school administration had no authority over individuals or groups outside the school, and while they undertook to handle and control the situation within the school by the employment of normal disciplinary procedures, they were unable to do so because of the nature and source of the opposition to integration both inside and outside the school.

It is important to realize, as is shown by the evidence, that the racial incidents and vandalism which occurred in Central High School during the past year did not stem from mere lawlessness on the part of the white students in the school, or on the part of the people of Little Rock outside the school; nor did they stem from any malevolent desire on the part of the students or others concerned to bomb the school, or to burn it down, or to injure or persecute as individuals the nine Negro students in the school. Rather, the source of the trouble was the deep seated popular opposition in Little Rock to the principle of integration, which, as is known, runs counter to the pattern of southern life which has existed for over three hundred years. The evidence also shows that to this opposition was added the conviction of many of the people of Little Rock, that the Brown decisions do not truly represent the law, and that by virtue of the 1956–57 enactments, heretofore outlined, integration in the public schools can be lawfully avoided.

In this connection, the president of the Board, Mr. Upton, testified that between the spring and fall of 1957 there was a marked change in public attitude towards the plan, that persons who had formerly been willing to accept it had changed their minds and had come to the conclusion "that the local School Board had not done all it could do to prevent integration, and that we didn't have to have integration"; and Vice-principal Powell testified that he believed that the white children involved in the incidents "feel that they are morally correct in their attitude and in their opposition," and that such is due to the "cultural patterns and sociological patterns in this community for many years," and that the students who created the incidents felt that it was wrong to integrate the Negro children into Central High School.

With respect to the effects of the 1956 constitutional amendment and initiated acts and of the 1957 statutes, Mr. Blossom testified that those enactments had their effect at Little Rock and throughout the State in stiffening opposition to the plan and in persuading people that there was no necessity for integration at this time.

Mr. Blossom further testified that the opposition to integration and the feeling that it was not required at this time had been greatly strengthened by numerous newspaper articles and advertisements, and by circulars and cards distributed in Little Rock, copies of which were introduced in evidence. Without prolonging this opinion by undertaking to abstract or quote from individual exhibits, we may say that we agree with Mr. Blossom's appraisal of their effect.

Those exhibits, in general, condemn the principle of integration; some of them condemn the Board and the Superintendent for alleged precipitateness in adopting the plan, and for their alleged mistreatment of white students during the past year; and many of them emphasize the idea that integration can be avoided by legal, constitutional means.

Regardless of the merits of the sociological and legal views expressed in those exhibits, the conclusion is inescapable that they are shared, in whole or in part, by a majority of the population of Little Rock, representing a cross section of the people of that city. On that point, Mr. Upton was asked in the course of his examination whether or not the people who had raised with him the questions which we have previously mentioned were fairly intelligent people, and he replied that they were, and that they were generally people who recognized him and who knew him. And Mr. Blossom expressed the opinion that the doubts and questions in the minds of many people were honest ones, and that it was his opinion that the great majority of the people of the community, from the contacts he had had with it, do not favor integration.

With further reference to the 1956–57 enactments it should be said that at least some of them are now involved in litigation pending in the state courts and after that litigation is decided by the trial courts, appeals will doubtless be taken to the Supreme Court of Arkansas, which alone can finally and authoritatively construe the same, and can, in the first instance, pass upon their validity; after the Supreme Court of Arkansas has ruled, these matters may well be carried to the Supreme Court of the United States for final review, all of which will take time. On that subject Mr. Blossom testified: "If you take the suits that are now pending and recognize the ones that are now being proposed, and none of them have been cleared out, the opinion that I would have would be that there are many, many months ahead before there will be any decision on

them, to where there is a clear-cut situation between state and federal law on this problem, and that, in itself, creates this dilemma. You don't know where you are."

Getting back to the effects of the events of the past school year on the educational program at Central High School, we find more specifically that those events have had a serious and adverse impact upon the students themselves, upon the class-room teachers, upon the administrative personnel of the school, and upon the overall school program. In addition, said events have cast a serious financial burden upon the school district, which it has had to meet at the expense of normal educational and maintenance functions.

As far as the students themselves are concerned, we think it obvious that the incidents and conditions that have been described could not have been good for them emotionally; but aside from that, their education has certainly suffered and under existing conditions will continue to suffer, as is shown by the testimony of the class-room teachers called by the Board.

For example, Mr. W. P. Ivey, who has taught mathematics in the Little Rock school district for 34 years and who has been on the faculty of Central High School ever since that school was opened in 1927, testified that the presence of the Negro students created a tension on the part of both students and teachers that was noticeable every day, and that this tension impaired his ability to teach and the receptivity of his students. On cross-examination he stated that the final results obtained by him in his classes were not as good as they had been in prior years, as evidenced by his tests and also by comparison of the grades made in his classes which included Negro students with the grades made in his classes not attended by any of the Negroes.

Another member of the faculty who described the adverse effect that the presence of the Negro students, and all that went with it, had on educational

standards was Mrs. Govie Griffin, who has taught chemistry for 13 terms at Central. The subject that she teaches is an elective course, taken principally by those who plan to go to college and who presumably are interested in mastering the subject. It was her observation that the presence of the troops in the school, their standing outside of class-room doors during recitations, and their actions in walking up and down the halls, occasionally dropping their clubs, all had a disturbing effect on pupils and teachers alike. Due to that situation and the prevailing tension and unrest, the amount of subject matter that she was able to offer in her chemistry course was so seriously curtailed that she had to request that standard achievement tests usually given at the close of the school year be not given; and her request was granted. She said in this regard: "In the past we have always given standardized tests at the close of the school year, and the pupils have always been far above the national norm. This year I requested they not be given the test in all fairness to the students because we had not covered the material we had in the past years."

As to the effect of the events of the past session on the class-room teachers and administrative staff personally, the observations and experiences of Mrs. Elizabeth Huckaby, vice-principal for girls, who has been at Central since 1930, are informative. She stated that normally in addition to her administrative duties she taught two English classes, but that during the past year she has been compelled to give up those classes and to devote all of her time to administrative duties, and that from 75 to 90 percent of her time was devoted to problems created by integration. These problems, and the unrest and tension in the school had an adverse effect upon her nerves and physical well being. She testified that apprehension over existing conditions caused her to lose sleep, which problem she had never had before; that she had no social life because of her exhaustion at the end of each day, and

that on week ends she and her husband would go to the country and relax, and that by noon on Sunday she "would begin to revive enough to face the next week." Mrs. Huckaby also observed that other teachers were likewise suffering ill effects; she stated that some would come to her trembling, and that others would come weeping because of the events that were transpiring, and she pointed out in this connection that teachers in the main are not accustomed to violence.

Mrs. Huckaby's testimony as to the effect of the integration problems on the class-room teachers was corroborated by that of Mrs. Margaret Ryman, a mathematics teacher, and of Mrs. Shirley Stancil, a guidance counsellor, and likewise by the testimony of Mr. Blossom. The latter stated that one of his greatest concerns during the year was the health and welfare of the teachers, and that he felt very strongly that the teachers were under more strain than the students since they had upon their shoulders the responsibility for the physical welfare and educational progress of every student in the school, and that "they took that responsibility to heart and it affected many of them and that was reflected in many of the conferences I had with them as individuals."

The tension and strain to which the administrative staff was subjected did not terminate with the close of the school day. Mr. Powell stated that on a typically difficult day his phone would commence ringing as soon as he got home from school, the calls coming from people desiring various types of information; that he has spent as much as three hours on certain days "answering the telephone, or in making calls or dodging calls;" that he has had to work long hours during the evenings and nights on many occasions, and that his social life and normal rest had been interfered with to a definite extent during the entire school year.

Along the same lines Mr. O. W. Romine, Director of School Plant Services for the entire school district, testified that under normal conditions he worked

from eight in the morning until five in the afternoon, and that after hours' duty was rare. During the past year, however, he had been on call 24 hours a day, and had received hundreds of calls at all hours of the night; on many occasions when his telephone had rung, and he had picked up the receiver, he found no one on the line. At one stage of the troubles he was away from home so much at night that he did not see his youngest child for four days, since he would get in at night after the child had gone to bed and would be gone in the morning before the child awoke.

The subject matter of some of the exhibits introduced by the Board consisted, in part at least, of personal attacks on the Board members and the administrative staff, which could not have failed to have reacted unfavorably upon them personally. In addition, Mr. Blossom was the recipient of many threats against his physical safety and well being. Of the Board members, Mr. Upton, at least, was subjected to much personal harrassment, mainly by telephone calls, and to such an extent that he had to take an unlisted number.

It is too clear to require discussion that the experiences of the classroom teachers and of the administrative staff must have produced at least some loss of personal efficiency on their part, with corresponding damage to the educational program. More serious, however, is the fact that it has been necessary to divert the time and talents of the trained administrative personnel from their normal duties in dealing with the many complex problems involved in the operation of a high school like Central to purely disciplinary matters; and we find, as alleged by the Board, that the efforts of the administrative staff to cope with the integration problems with which they have been confronted have consumed an undue amount of their time and energy; and we agree with Mr. Blossom in his statement that the diversion of administrative skills and energies to discipline maintenance during the past year may have been one of the highest prices that

the school district has had to pay. At least one serious result of such diversion is that the curriculum planning which had been previously emphasized at Central, has been seriously impeded. In addition, the building program has been held up although the District's enrollment is rapidly increasing, with an accompanying need for more facilities.

As stated, the evidence further showed that the school district has had to shoulder substantial financial burdens on account of integration, and that this has been at the expense of other school programs. Mr. Romine testified, for example, that it was necessary to employ five additional night watchmen at the high school and that the cost for this item alone was between nine and ten thousand dollars; further, when it became necessary to relieve Mr. Powell and Mrs. Huckaby of their teaching duties so that they could devote their energies to the administrative problems with which the school was confronted, substitutes had to be hired to take their places in the classrooms. Moreover, the Board had to spend money to repair the damages to the school property, and to replace locks which had to be cut off of lockers during bomb searches; on that point Mr. Romine said that at one time he saw a bushel basket full of cut locks, and that it cost the Board $1.25 apiece to replace them. Mr. Romine further testified that the overall maintenance budget for all the schools in the district for the fiscal year ending June 30 of the current year was $123,000, that by January of this year he saw that unless something was done that budget would be cverrun by approximately $17,000. In order to stay within the budget it was necessary he said to dismiss the paint crew of five men, thus saving not only their wages but also the cost of the paint they would have used, and to forego some normal maintenance work on the school properties.

Mr. Blossom testified that the funds of the Little Rock School District are not unlimited, that in fact the district is underfinanced, and the annual expenditure

per child is approximately $100 below the national average. He further pointed out that whenever district funds have to be diverted to meet unusual problems as they were during the past year, the district suffers harm, and that such diversions may mean that less teachers can be employed, and less instructional equipment purchased.

Looking toward the approaching school term it was the consensus of opinion on the part of the Board's witnesses, and we find, that there has been no softening of the public attitude in Little Rock toward integration, and we further find, as heretofore stated, that unless some relief is granted the Board the conditions that will prevail in Central High School during the 1958–59 school year will be as bad as they were during 1957–58, and will probably deteriorate still further. One reason for this conclusion is that, according to the evidence, Central High School operated last year largely on a momentum that had been built up during past years, and that momentum is running down. Any efficient organization, manned by skilled personnel, as was Central High School in September, 1957, can operate for a time on its momentum even in the face of severe pressure; but with such pressure a time comes when that momentum is lost, and when that happens then, unless the pressure is removed the organization breaks down. We are convinced that such point is being approached at Central. Mr. Blossom stated in that connection that the strain of the past year had already taken its toll, and would be felt still further when school opens this fall, and that starting into another year would be entirely different from the commencing of school last September. In this he was corroborated by Mrs. Huckaby.

We further find that if the attendance of Negro students at Central High School is to be maintained during the next school year, the Board will have to have military assistance or its equivalent, and it is financially unable to bear the expense of hiring a sufficient number of guards to control the situation. It cannot be expected that the Little Rock Police Department will be in a position to detail enough men to afford the necessary protection.

As to the need for troops when school re-convenes, Superintendent Blossom stated that he saw nothing to indicate that conditions at the school would be different in September than they were throughout the past year, and that as a school administrator he saw no lessening of responsibility for the safety of everyone concerned; he said, "We have that responsibility just as greatly today as we did yesterday, and we will have it tomorrow." And when asked whether or not it would be necessary to have the same guards and civilian security employees in the school in September, he replied: "As I said before, I have no reason to anticipate anything different from what we had. If we take what history teaches us, I think that will be a natural conclusion."

Now, while troops can disperse crowds, and can keep the Negro students physically within the school, and while it is possible that if troops were deployed in sufficient numbers all over the school vandalism could be checked, the presence of troops cannot reduce or eliminate racial tensions, or create a climate that is conducive to education; on the contrary, the presence of armed soldiers in a school is, as has been shown here, disrupting to the educational process. As to the importance of a proper educational climate, Mr. Blossom said: " * * * any educational program needs to have certain things present in the atmosphere, such as a climate where children can be taught and teachers can teach. We have contended that that condition has not existed at Central High School, that it is not likely to exist next year. Now, in putting on any educational program, the proper conditions are about as necessary as the proper tools and the proper teachers." Furthermore, when Mrs. Huckaby was asked on cross-examination if she did not think that the Board, the school administration, the city authorities, and the military could carefully plan the run-

ning of the high school, she replied that she did not relish the idea of having those particular groups always involved in her educational system, because as an educator such was foreign to her experience.

As has been said, there can be no question that the Board made a prompt and reasonable start toward compliance with the principles laid down in the Brown cases; thereafter, it put its plan into operation and has adhered to it in good faith in the face of great difficulties. Now, it has come here seeking relief only after it has been confronted with what is, from an educational standpoint, an intolerable situation, and it does not ask for an abandonment of its plan nor does it attempt to obtain an indefinite postponement. It is simply requesting a tactical delay. We are convinced that in seeking this delay the Board is still acting in good faith, and, upon the showing that has been made, we are satisfied that the Board needs more time to carry out its plan in an "effective manner," and that to grant the instant petition is in the public interest, and is consistent with good faith compliance, at the earliest practicable date, with the principles above mentioned. In reaching this conclusion we are not unmindful of the admonition of the Supreme Court that the vitality of those principles "cannot be allowed to yield simply because of disagreement with them;" here, however, as pointed out by the Board in its final brief, the opposition to integration in Little Rock is more than a mere mental attitude; it has manifested itself in overt acts which have actually damaged educational standards and which will continue to do so if relief is not granted.

We have seen that the Supreme Court said in the second Brown decision that the transition of a formerly segregated school to a school free from compulsory segregation should be carried out in an "effective manner," and that such a transition is in the public interest. In our estimation a transition which impairs or disrupts educational programs and standards, and which will continue to do so, is not in the public interest, but, on the other hand, inflicts irreparable harm upon all of the students concerned, regardless of race. Where, as here, such a transition is being undertaken under the compulsive effects of a federal court order, a refusal to modify such order so as to ameliorate the situation would in our opinion under the circumstances here present be inequitable, if not arbitrary as well.

That the Supreme Court recognized the necessity of maintaining educational standards is evidenced by the following language in the first Brown decision:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. * * *" Brown v. Board of Education, supra, 347 U.S. at page 493, 74 S.Ct. at page 691.

And Judge Miller, in his original opinion in this case, pointed out that the Board was undertaking not only to work out a program of integration, but also to preserve and improve educational standards; and he took occasion to say: "(The Board) must consider the personal rights of all qualified persons to be admitted to the free public schools as soon as practicable on a nondiscriminatory basis. The public interest must be considered along with all the facts and conditions prevalent in the school district. Educational standards should not be

lowered. \* \* \* " (Aaron v. Cooper, supra, 143 F.Supp at pages 864–865.) Furthermore, the Court of Appeals in its affirming opinion said: " \* \* \* The schools of Little Rock have been on a completely segregated basis since their creation in 1870. That fact, plus local problems as to facilities, teacher personnel, the creation of teachable groups, the establishment of the proper curriculum in desegregated schools and at the same time the maintenance of standards of quality in an educational program may make the situation at Little Rock, Arkansas, a problem that is entirely different from that in many other places." Aaron v. Cooper, supra, 243 F.2d at page 364.

The importance of maintaining educational standards today is certainly no less than it has been in prior years; in fact it is more urgent. And while the Negro students at Little Rock have a personal interest in being admitted to the public schools on a nondiscriminatory basis as soon as practicable, that interest is only one factor of the equation, and must be balanced against the public interest, including the interest of all students and potential students in the district, in having a smoothly functioning educational system capable of furnishing the type of education that is necessary not only for successful living but also for the very survival of our nation and its institutions. There is also another public interest involved, namely, that of eliminating, or at least ameliorating, the unfortunate racial strife and tension which existed in Little Rock during the past year and still exists there.

When the interests involved here are balanced, it is our opinion, in view of the situation that has prevailed and will in the foreseeable future continue to prevail at Central High School under existing conditions, the personal and immediate interests of the Negro students affected, must yield temporarily to the larger interests of both races.

While we do not seek at this time to authoritatively define the term "all deliberate speed" employed by the Supreme Court in the Brown case, it does seem to us that the term is a relative one, dependent upon varying facts and circumstances in different localities, and that what might be "deliberate speed" under one set of circumstances could constitute headlong haste under another. And it further appears to us that said term involves the idea of a progress toward the elimination of compulsory segregation that is consistent with the maintenance of sound educational standards and a salutary educational atmosphere, neither of which can be maintained at Central High School if the Board is compelled to keep its plan in operation at this time. After all, the function of any public school system, whether integrated or not, is to educate people.

It is important to realize that to grant the stay requested by the Board will not deprive any Negro student of a good high school education. In 1957 the completely new and up-to-date Horace Mann High School for Negroes was put into operation, and in that school, apart from any question of integration, the Negro students can receive an education equal to that provided in Central High School. As to the Horace Mann School, Mr. Blossom testified that, relatively speaking, the quality of education in that school, measured by any desired indicia, whether facilities, teacher preparation, teaching aids, or instructional supplies, is "on a par with any other school." He further stated with reference to the past session: "The truth of the business is it was better than most high schools in this State, white or colored." He also testified that he felt that the Negro students could in 1958 "be better educated in another manner without them being hurt."

The granting of the Board's petition does not, in our estimation, constitute a yielding to unlawful force or violence, but is simply an exercise of our equitable discretion and good judgment so as to allow a breathing spell in Little Rock,

while at the same time preserving educational standards at Central High School.

At one point in his testimony Mr. Blossom stated, and we agree with him, that a tactical delay is not the same as a surrender; and the delay here sought is not a vain thing or a mere frustration of the plaintiffs' rights. In the first place, the delay, in and of itself, may well be of material value to the Board in carrying out its announced purposes. In the two and one-half year period involved tempers will have a chance to cool down, emotions may subside to some extent, and there may also be changes in some of the personalities involved in the dispute. Of more significance, however, is the fact that the delay will afford time for the completion of the pending litigation in the state courts and for an appraisal of the results of that litigation. Obviously, should the state legislation challenged in that litigation be upheld as valid, such a result might well have a profound effect on the situation at Little Rock. On the other hand, should that legislation be held unconstitutional, and particularly if such a result should be reached by the state courts, the people of Little Rock might be much more willing to acquiesce in integration as contemplated by the plan.

What has just been said likewise indicates that the length of the proposed stay is reasonable, and we so find. On this point we agree with the opinion expressed by Mr. Upton, who is an experienced lawyer, that it will take at least two years for the litigation above referred to to be finally terminated. In addition to that, considering the nature of the problem, two and one-half years is not a very long period of time; and a very short delay would serve no useful purpose. Added to those considerations is the fact that the Board and the Superintendent, who are familiar with the problem and whose responsibility it was in the first instance to decide how long a stay was desired, after considering the various factors involved determined on a two and one-half year period, and deemed it desirable to resume the plan at midterm of the 1960–61 school year. And we do not believe that under the circumstances the Court should disturb their judgment, even if it were inclined to do so.

■ In their brief in support of their motion to dismiss the original petition the plaintiffs cited a number of cases[3] standing for the proposition that an injunction may not be dissolved or modified in the absence of a showing of unforeseeable changes in conditions which have created an exceptional situation. While none of those cases involved any problem of race relations or school integration, we do not quarrel with the general rule laid down therein and the Board in its brief in opposition to the motion concedes "that the situation must be 'extraordinary' and that the circumstances must be 'exceptional.' "

Here, however, there has been a very radical change of situation since the former orders of this Court were entered, the occurrence and extent of which were not, to our mind, foreseeable at that time. And the situation with which the Board is now confronted is certainly exceptional and extraordinary if not, indeed, unique, that situation being complicated

3. Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266; Ackermann v. United States, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207; United States v. Swift & Co., supra, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; Walling v. Harnischfeger Corporation, D.C.Wis., 142 F.Supp. 202, affirmed 7 Cir., 242 F.2d 712; John E. Smith's Sons Co. v. Lattimer Foundry & Machine Co., 3 Cir., 239 F.2d 815; Federal Deposit Ins. Corp. v. Alker, 3 Cir., 234 F.2d 113; Smith v. Kincade, 5 Cir., 232 F.2d 306; Morse-Starrett Products Co. v. Steccone, 9 Cir., 205 F. 2d 244; Elgin National Watch Co. v. Barrett, 5 Cir., 213 F.2d 776; Bigelow v. Twentieth Century-Fox Film Corp., 7 Cir., 183 F.2d 60; Coca Cola Co. v. Standard Bottling Co., 10 Cir., 138 F.2d 788; United States v. Besser Manufacturing Co., D.C.Mich., 125 F.Supp. 710; Sunbeam Corporation v. Charles Appliances, D.C.N.Y., 119 F.Supp. 492.

by the vast amount of publicity that has been given to it.

It must be remembered that when Judge Miller handed down his decision in 1956, the people of Arkansas and the legislature had not adopted the measures that we have mentioned; on the contrary, the 1955 legislature had refused to enact certain similar legislation. And when Judge Davies on September 3, 1957 ordered the Board to put its plan into effect forthwith, and when he denied the Board's application for a stay on September 7, and when he entered his order of September 20 enjoining the Governor from further interfering with the operation of the plan, the Negro students had not begun attending classes at the school, federal soldiers had not appeared upon the scene, repeated racial incidents had not occurred, the teachers had not been frightened and demoralized, and educational standards had not been impaired. All of this has taken place since the final order entered by Judge Davies, and we do not believe that he foresaw the result that has come about. On the contrary, in his findings of fact and conclusions of law in connection with the injunction against the Governor he took occasion to refer to the history of peaceful race relations in Little Rock, and to state that prior to the calling out of the Guard the "faculty and the white student body at Central High School were prepared to accept the 9 colored children as fellow students." Aaron v. Cooper, D.C. Ark., 156 F.Supp. at page 224.

As we have said, the fundamental position of the plaintiffs in opposing the petition appears to be that popular opposition to the plan, resulting in obstructions to its orderly operation, does not form any legal basis for affording the Board any relief in this case. In support of that argument counsel for the plaintiffs have cited the following cases: Allen v. County School Board of Prince Edward County, Va., 4 Cir., 249 F.2d 462, certiorari denied 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530; Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, certiorari denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436; Jackson v. Rawdon, 5 Cir., 235 F.2d 93, certiorari denied 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed. 2d 160; Mitchell v. Pollock, D.C.Ky., 1 Race Rel.L.Rep. 1038; School Board of City of Charlottesville, Va. v. Allen, 4 Cir., 240 F.2d 59, certiorari denied 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664; and School Board of City of Newport News, Va. v. Atkins, 4 Cir., 246 F.2d 325, certiorari denied 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed.2d 63.

Those cases unquestionably hold that a school board is not justified in failing to make a prompt and reasonable start toward the elimination of compulsory segregation merely because of popular opposition to such a step. But none of them has involved a situation like the instant one where a board has made a prompt and reasonable start, and has actually put its plan into operation, only to find it break down in practice with a consequent impairment of educational standards and demoralization of the faculty and student body.

It is one thing to say that a school board must make a start in the direction of integration without regard to public feelings on the subject, as Judge Hutcheson said in Jackson v. Rawdon, supra; but it is quite another thing to say that when a school board has had the experiences with its plan which the Little Rock Board has had, and when, after observing the results of that plan in operation, it comes into federal court seeking not to abandon the plan or to lay it aside indefinitely, but merely a moratorium, the court must close its eyes and ears to the practical problem with which such board is confronted. Such a judicial attitude would be most unrealistic.

If popular feelings and attitudes are utterly and at all times irrelevant to the question under consideration, the Court of Appeals in affirming Judge Miller in this case would hardly have stopped to point out that the Little Rock schools had been segregated for over 80 years; nor would there have been any occasion for the Court of Appeals to say in the New Orleans case that once a school board

has accepted the principle laid down in the Brown decisions, it may well be entitled to "time for such reasonable steps in the process of desegregation as appears to be helpful in avoiding unseemly confusion and turmoil." Orleans Parish School Board v. Bush, supra., 5 Cir., 242 F.2d at page 166.

Plaintiffs have also cited Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153; Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243; Morgan v. Com. of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L. Ed. 1317; and City of Birmingham v. Monk, 5 Cir., 185 F.2d 859, certiorari denied 341 U.S. 940, 71 S.Ct. 1001, 95 L.Ed. 1367. Those cases hold that ordinarily enforcement of individual constitutional rights will not be delayed because of the public interests opposed to them, and that the State cannot deprive one of a constitutional right through the exercise of the police power. None of those cases, however, was a school integration case, and, as has been pointed out, the second Brown decision itself recognizes the propriety of delay in school integration under proper circumstances.

██ In the instant case it is not denied that under the Brown decisions the Negro students in the Little Rock District have a constitutional right not to be excluded from any of the public schools on account of race; but the Board has convincingly shown that the time for the enjoyment of that right has not yet come. That showing applies to the Negro students who were in the school last year as well as to others. While the plaintiffs contend that the rights of the students last mentioned have become vested, no authority in support of that proposition has been cited to us, and we know of no such authority, and we do not believe that such contention can be sustained.

In support of their argument that if the Board had used sufficiently firm disciplinary measures it could have controlled the situation within the school, and that by such measures it can reestablish control this coming year, the plaintiffs called to the stand the two New York educators heretofore mentioned, and their opinion evidence was in line with the plaintiffs' contentions. On the other hand, the testimony of Mr. Blossom and of Mr. Upton, was to the effect that the Board had diligently sought to preserve discipline, that it had expelled a few students and had suspended others for various periods of time, that it had undertaken to consider each case on its own merits and the effect of the action to be taken not only upon the individual child concerned but also upon the other students in the school. It was the opinion of those witnesses that in view of the unusual situation with which they were confronted and of the source and nature of the opposition with which they were faced conditions would have been made worse rather than better by the employment of harsh disciplinary measures such as mass expulsions, and that the course that had been in fact pursued was the best possible one under the existing circumstances.

While Dr. Rogers and Dr. Salten are doubtless well qualified to express opinions as to how school matters should be handled in areas of the country with which they are familiar and in which they have had experience, neither of those gentlemen has had any public school administrative experience in the South, or any personal familiarity with the Little Rock situation; nor has either of them ever had any experience with the problems involved in the transition from segregation to integration in a state where the former has been the accepted and traditional mode of life of the people and where its existence in the public schools has had the sanction of law for so long as those schools have existed. As regards Dr. Rogers in particular, his qualifications to speak on this subject were seriously impaired, in our eyes, by his suggestion that members of the student body at Central High School might have been used, in effect, as spies upon other students there. In view of these

limitations upon the qualifications of the plaintiffs' witnesses, we cannot accept their opinions in preference to that of Mr. Blossom, who is also an expert, and who formed his opinion on the ground and has based it upon his own intimate experience with the problem.

It is true that the views of Vice-principal Powell coincide with the opinions of the plaintiffs' experts, as far as the situation inside the school is concerned; but is must be remembered that Mr. Powell had no ultimate disciplinary authority and no responsibility for any matters of overall policy; he was a subordinate employee, and it was not shown what qualifications, if any, he possesses as an expert in public school administration. He testified that he graduated from Central High School in 1940, that he was employed at the school in an undisclosed capacity in 1952, and that he has been vice-principal for boys for the past three years. His training and experience between 1940 and 1952 were not brought out in the evidence. It is also interesting to note in this connection that Mr. Powell's counterpart, Mrs. Huckaby, did not feel that the employment of stern disciplinary measures was the key to the problem. Actually, it occurs to us that Mr. Powell may well have been so close to the situation in all of its personally unpleasant aspects, that he has to some degree lost his sense of perspective in the matter.

█ In addition to all of the foregoing, it is well to keep in mind that the duty of maintaining discipline in the schools and of deciding what disciplinary steps should be taken is primarily the function of the school administration, and not that of the Court; and we would certainly be unwilling to substitute our judgment as to what should have been done for that of the Board in the absence of a showing that the Board had erred to such an extent as to indicate an absence of good faith on its part. There has been no such showing here.

█ Relative to interference from outside the school, the plaintiffs urge that the Board should have either instituted criminal prosecutions against the persons responsible, or that it should have applied for injunctive relief, as was done in the Hoxie, Arkansas, and Clinton, Tennessee, cases. See Hoxie School District No. 46 of Lawrence County, Ark. v. Brewer, D.C.Ark., 137 F.Supp. 364, affirmed 8 Cir., 238 F.2d 91; and Kasper v. Brittain, 6 Cir., 245 F.2d 92, certiorari denied 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed. 2d 46. In answer to that argument Mr. Blossom testified, and he was corroborated by Mr. Upton, that the Board had determined as a matter of judgment not to resort to criminal prosecutions or to seek injunctive relief; that it was not the function of the Board to prosecute people or to seek injunctions but to run a school system, and that it had already had all of the litigation that it wanted and was not anxious for any more.

█ We think that the Board acted within its competency in coming to that conclusion, and we do not think that its failure to commence criminal actions or to seek injunctive relief should militate against its present petition. In the first place, the Board is not charged with the duty of commencing criminal prosecutions or of enforcing the criminal laws of the State. Secondly, by reason of the nature, source and extent of the opposition to integration in Little Rock, actions by the Board looking toward criminal prosecutions or injunctions might have aggravated rather than eased the situation. Moreover, the Board might have had a good deal of difficulty in identifying the persons causing the trouble or in establishing that their conduct constituted crimes or was of such quality as would justify the granting of injunctive relief.

As far as the Hoxie and Clinton cases are concerned, Mr. Blossom testified, and we agree, that the situation at neither of those places was comparable to the situation that has existed and now exists in Little Rock. Both Hoxie and Clinton are much smaller places than Little Rock; hence the procedures followed in the for-

mer places might not be effective in the latter.

As an illustration of the differences in situation just mentioned, attention is called to the fact that Judge Reeves' opinion in the Hoxie case discloses that the total integrated student body at Hoxie was 1025, of which only 25 students were Negroes, whereas Judge Miller's opinion in this case shows that the percentage of Negroes to whites in the high school grades at Little Rock, as of May, 1956, was .229, such percentage in the junior high grades was .246, and in the elementary grades .262, the overall percentage being .252. Moreover, Judge Reeves' opinion also makes clear that the educational facilities for Negroes at Hoxie were by no means comparable to those available to the white students, which is not the case at Little Rock.

As to the Clinton, Tennessee, case we take judicial notice of the fact that Clinton is a small town located in the mountainous country of eastern Tennessee where there are very few Negroes. In addition, the trouble there was readily traceable to one individual from outside the State, as is shown by the evidence in this case and by the opinion of the Court of Appeals in Kasper v. Brittain, supra.

It being in the public interest, including the interest of both white and Negro students at Little Rock, that we have a peaceful interlude for the period mentioned, an order is being entered permitting the Board to suspend the operation of its said plan until midsemester of the 1960–61 school year, without the Board, or the individual members thereof, or the Superintendent of Schools being considered in contempt of this Court; and the Court retains jurisdiction of this cause for such other and further proceedings as may hereafter become necessary or appropriate.

On Plaintiffs' Motion for Supersedeas

The motion of the plaintiffs to stay the enforcement of the judgment in this action rendered by us on June 20, 1958, pending appeal therefrom, having been given due consideration by the Court, is hereby denied.

As we understand the law, we have a discretion in this matter; and we feel that that discretion should be exercised in denying the motion, primarily for the reason that from a practical standpoint to grant this motion and stay the enforcement of our judgment would to a large extent nullify our order in the cause since it will in all probability take months to carry the case through the Court of Appeals and the United States Supreme Court; and in the meantime the situation at Central High School which we have found to be intolerable from an educational standpoint would continue from the beginning of the approaching session to the final ruling of the Supreme Court on the merits of the case; and for the reasons stated in our opinion in said cause we do not think that such is in the public interest, including the interest of both the white and Negro students in the Little Rock District.

The Honorable Archibald K. Gardner, Chief Judge of this Circuit, in assigning us to handle the School Board's plea, gave us up to and including September 1, 1958, within which to try and decide the case. In order that any aggrieved party might apply for appellate relief before the beginning of the next school session, our preliminary proceeding, the trial and the preparation and filing of our opinion and order were speeded up as fast as we felt such could be done and at the same time give proper consideration to the cause.

We do not feel that the plaintiffs are deprived of the opportunity of securing an appellate ruling on their motion for supersedeas by reason of the action we are now taking, since it will be more than two months before Central High School convenes this Fall, and in the meantime the plaintiffs can apply at least to the Court of Appeals of this Circuit for a stay of the enforcement of our judgment in this action.