# COOPER ET AL., MEMBERS OF THE BOARD OF DIRECTORS OF THE LITTLE ROCK, ARKANSAS, INDEPENDENT SCHOOL DISTRICT, ET AL. v. AARON ET AL.

No. 1. Argued September 11, 1958.—Decided September 12, 1958.—Opinion announced September 29, 1958.

*Richard C. Butler* argued the cause for petitioners. With him on the brief were *A. F. House* and, by special leave of Court, *John H. Haley, pro hac vice.*

*Thurgood Marshall* argued the cause for respondents. With him on the brief were *Wiley A. Branton, William Coleman, Jr., Jack Greenberg* and *Louis H. Pollak.*

*Solicitor General Rankin,* at the invitation of the Court, *post,* p. 27, argued the cause for the United States, as *amicus curiae,* urging that the relief sought by respondents should be granted. With him on the brief were *Oscar H. Davis, Philip Elman* and *Ralph S. Spritzer.*

Opinion of the Court by THE CHIEF JUSTICE, MR. JUSTICE BLACK, MR. JUSTICE FRANKFURTER, MR. JUSTICE DOUGLAS, MR. JUSTICE BURTON, MR. JUSTICE CLARK, MR. JUSTICE HARLAN, MR. JUSTICE BRENNAN, and MR. JUSTICE WHITTAKER.

As this case reaches us it raises questions of the highest importance to the maintenance of our federal system of government. It necessarily involves a claim by the Governor and Legislature of a State that there is no duty on state officials to obey federal court orders resting on this Court's considered interpretation of the United States Constitution. Specifically it involves actions by the Governor and Legislature of Arkansas upon the premise that they are not bound by our holding in *Brown* v. *Board of Education,* 347 U. S. 483. That holding was that the Fourteenth Amendment forbids States to use their governmental powers to bar children on racial grounds from attending schools where there is state participation through any arrangement, management, funds or property. We are urged to uphold a suspension of the Little Rock School Board's plan to do away with segregated public schools in Little Rock until state laws and efforts to upset and nullify our holding in *Brown* v. *Board of Education* have been further challenged and tested in the courts. We reject these contentions.

The case was argued before us on September 11, 1958. On the following day we unanimously affirmed the judgment of the Court of Appeals for the Eighth Circuit, 257 F. 2d 33, which had reversed a judgment of the District Court for the Eastern District of Arkansas, 163 F. Supp. 13. The District Court had granted the application of the petitioners, the Little Rock School Board and School Superintendent, to suspend for two and one-half years the operation of the School Board's court-approved desegregation program. In order that the School Board

might know, without doubt, its duty in this regard before the opening of school, which had been set for the following Monday, September 15, 1958, we immediately issued the judgment, reserving the expression of our supporting views to a later date.* This opinion of all of the members of the Court embodies those views.

The following are the facts and circumstances so far as necessary to show how the legal questions are presented.

On May 17, 1954, this Court decided that enforced racial segregation in the public schools of a State is a denial of the equal protection of the laws enjoined by the Fourteenth Amendment. *Brown* v. *Board of Education,*

---

*The following was the Court's *per curiam* opinion:

"Per Curiam.

"The Court, having fully deliberated upon the oral arguments had on August 28, 1958, as supplemented by the arguments presented on September 11, 1958, and all the briefs on file, is unanimously of the opinion that the judgment of the Court of Appeals for the Eighth Circuit of August 18, 1958, 257 F. 2d 33, must be affirmed. In view of the imminent commencement of the new school year at the Central High School of Little Rock, Arkansas, we deem it important to make prompt announcement of our judgment affirming the Court of Appeals. The expression of the views supporting our judgment will be prepared and announced in due course.

"It is accordingly ordered that the judgment of the Court of Appeals for the Eighth Circuit, dated August 18, 1958, 257 F. 2d 33, reversing the judgment of the District Court for the Eastern District of Arkansas, dated June 20, 1958, 163 F. Supp. 13, be affirmed, and that the judgments of the District Court for the Eastern District of Arkansas, dated August 28, 1956, see 143 F. Supp. 855, and September 3, 1957, enforcing the School Board's plan for desegregation in compliance with the decision of this Court in *Brown* v. *Board of Education,* 347 U. S. 483, 349 U. S. 294, be reinstated. It follows that the order of the Court of Appeals dated August 21, 1958, staying its own mandate is of no further effect.

"The judgment of this Court shall be effective immediately, and shall be communicated forthwith to the District Court for the Eastern District of Arkansas."

347 U. S. 483. The Court postponed, pending further argument, formulation of a decree to effectuate this decision. That decree was rendered May 31, 1955. *Brown* v. *Board of Education,* 349 U. S. 294. In the formulation of that decree the Court recognized that good faith compliance with the principles declared in *Brown* might in some situations "call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision." *Id.,* at 300. The Court went on to state:

> "Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

> "While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." 349 U. S., at 300–301.

Under such circumstances, the District Courts were directed to require "a prompt and reasonable start toward full compliance," and to take such action as was necessary to bring about the end of racial segregation in the public schools "with all deliberate speed." *Ibid.* Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practicable completion of desegregation, and had taken appropriate steps to put their program into effective operation. It was made plain that delay in any guise in order to deny the constitutional rights of Negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance. State authorities were thus duty bound to devote every effort toward initiating desegregation and bringing about the elimination of racial discrimination in the public school system.

On May 20, 1954, three days after the first *Brown* opinion, the Little Rock District School Board adopted, and on May 23, 1954, made public, a statement of policy entitled "Supreme Court Decision—Segregation in Public Schools." In this statement the Board recognized that

"It is our responsibility to comply with Federal Constitutional Requirements and we intend to do so when the Supreme Court of the United States outlines the method to be followed."

Thereafter the Board undertook studies of the administrative problems confronting the transition to a desegregated public school system at Little Rock. It instructed the Superintendent of Schools to prepare a plan for desegregation, and approved such a plan on May 24, 1955, seven days before the second *Brown* opinion. The plan provided for desegregation at the senior high school level (grades 10 through 12) as the first stage. Desegregation at the junior high and elementary levels was to follow. It was contemplated that desegregation at the high school level would commence in the fall of 1957, and the expectation was that complete desegregation of the school system would be accomplished by 1963. Following the adoption of this plan, the Superintendent of Schools discussed it with a large number of citizen groups in the city. As a result of these discussions, the Board reached the conclusion that "a large majority of the residents" of Little Rock were of "the belief . . . that the Plan, although objectionable in principle," from the point of view of those supporting segregated schools, "was still the best for the interests of all pupils in the District."

Upon challenge by a group of Negro plaintiffs desiring more rapid completion of the desegregation process, the District Court upheld the School Board's plan, *Aaron* v. *Cooper,* 143 F. Supp. 855. The Court of Appeals affirmed. 243 F. 2d 361. Review of that judgment was not sought here.

While the School Board was thus going forward with its preparation for desegregating the Little Rock school system, other state authorities, in contrast, were actively pursuing a program designed to perpetuate in Arkansas the system of racial segregation which this Court had held violated the Fourteenth Amendment. First came, in November 1956, an amendment to the State Constitution flatly commanding the Arkansas General Assembly to oppose "in every Constitutional manner the Un-consti-

tutional desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court," Ark. Const., Amend. 44, and, through the initiative, a pupil assignment law, Ark. Stat. 80–1519 to 80–1524. Pursuant to this state constitutional command, a law relieving school children from compulsory attendance at racially mixed schools, Ark. Stat. 80–1525, and a law establishing a State Sovereignty Commission, Ark. Stat. 6–801 to 6–824, were enacted by the General Assembly in February 1957.

The School Board and the Superintendent of Schools nevertheless continued with preparations to carry out the first stage of the desegregation program. Nine Negro children were scheduled for admission in September 1957 to Central High School, which has more than two thousand students. Various administrative measures, designed to assure the smooth transition of this first stage of desegregation, were undertaken.

On September 2, 1957, the day before these Negro students were to enter Central High, the school authorities were met with drastic opposing action on the part of the Governor of Arkansas who dispatched units of the Arkansas National Guard to the Central High School grounds and placed the school "off limits" to colored students. As found by the District Court in subsequent proceedings, the Governor's action had not been requested by the school authorities, and was entirely unheralded. The findings were these:

"Up to this time [September 2], no crowds had gathered about Central High School and no acts of violence or threats of violence in connection with the carrying out of the plan had occurred. Nevertheless, out of an abundance of caution, the school authorities had frequently conferred with the Mayor and Chief of Police of Little Rock about taking appro-

priate steps by the Little Rock police to prevent any possible disturbances or acts of violence in connection with the attendance of the 9 colored students at Central High School. The Mayor considered that the Little Rock police force could adequately cope with any incidents which might arise at the opening of school. The Mayor, the Chief of Police, and the school authorities made no request to the Governor or any representative of his for State assistance in maintaining peace and order at Central High School. Neither the Governor nor any other official of the State government consulted with the Little Rock authorities about whether the Little Rock police were prepared to cope with any incidents which might arise at the school, about any need for State assistance in maintaining peace and order, or about stationing the Arkansas National Guard at Central High School." *Aaron* v. *Cooper,* 156 F. Supp. 220, 225.

The Board's petition for postponement in this proceeding states: "The effect of that action [of the Governor] was to harden the core of opposition to the Plan and cause many persons who theretofore had reluctantly accepted the Plan to believe there was some power in the State of Arkansas which, when exerted, could nullify the Federal law and permit disobedience of the decree of this [District] Court, and from that date hostility to the Plan was increased and criticism of the officials of the [School] District has become more bitter and unrestrained." The Governor's action caused the School Board to request the Negro students on September 2 not to attend the high school "until the legal dilemma was solved." The next day, September 3, 1957, the Board petitioned the District Court for instructions, and the court, after a hearing, found that the Board's

request of the Negro students to stay away from the high school had been made because of the stationing of the military guards by the state authorities. The court determined that this was not a reason for departing from the approved plan, and ordered the School Board and Superintendent to proceed with it.

On the morning of the next day, September 4, 1957, the Negro children attempted to enter the high school but, as the District Court later found, units of the Arkansas National Guard "acting pursuant to the Governor's order, stood shoulder to shoulder at the school grounds and thereby forcibly prevented the 9 Negro students . . . from entering," as they continued to do every school day during the following three weeks. 156 F. Supp., at 225.

That same day, September 4, 1957, the United States Attorney for the Eastern District of Arkansas was requested by the District Court to begin an immediate investigation in order to fix responsibility for the interference with the orderly implementation of the District Court's direction to carry out the desegregation program. Three days later, September 7, the District Court denied a petition of the School Board and the Superintendent of Schools for an order temporarily suspending continuance of the program.

Upon completion of the United States Attorney's investigation, he and the Attorney General of the United States, at the District Court's request, entered the proceedings and filed a petition on behalf of the United States, as *amicus curiae,* to enjoin the Governor of Arkansas and officers of the Arkansas National Guard from further attempts to prevent obedience to the court's order. After hearings on the petition, the District Court found that the School Board's plan had been obstructed by the Governor through the use of National Guard troops, and granted a preliminary injunction on Septem-

ber 20, 1957, enjoining the Governor and the officers of the Guard from preventing the attendance of Negro children at Central High School, and from otherwise obstructing or interfering with the orders of the court in connection with the plan. 156 F. Supp. 220, affirmed, *Faubus* v. *United States*, 254 F. 2d 797. The National Guard was then withdrawn from the school.

The next school day was Monday, September 23, 1957. The Negro children entered the high school that morning under the protection of the Little Rock Police Department and members of the Arkansas State Police. But the officers caused the children to be removed from the school during the morning because they had difficulty controlling a large and demonstrating crowd which had gathered at the high school. 163 F. Supp., at 16. On September 25, however, the President of the United States dispatched federal troops to Central High School and admission of the Negro students to the school was thereby effected. Regular army troops continued at the high school until November 27, 1957. They were then replaced by federalized National Guardsmen who remained throughout the balance of the school year. Eight of the Negro students remained in attendance at the school throughout the school year.

We come now to the aspect of the proceedings presently before us. On February 20, 1958, the School Board and the Superintendent of Schools filed a petition in the District Court seeking a postponement of their program for desegregation. Their position in essence was that because of extreme public hostility, which they stated had been engendered largely by the official attitudes and actions of the Governor and the Legislature, the maintenance of a sound educational program at Central High School, with the Negro students in attendance, would be impossible. The Board therefore proposed that the Negro students already admitted to the school be with-

drawn and sent to segregated schools, and that all further steps to carry out the Board's desegregation program be postponed for a period later suggested by the Board to be two and one-half years.

After a hearing the District Court granted the relief requested by the Board. Among other things the court found that the past year at Central High School had been attended by conditions of "chaos, bedlam and turmoil"; that there were "repeated incidents of more or less serious violence directed against the Negro students and their property"; that there was "tension and unrest among the school administrators, the class-room teachers, the pupils, and the latters' parents, which inevitably had an adverse effect upon the educational program"; that a school official was threatened with violence; that a "serious financial burden" had been cast on the School District; that the education of the students had suffered "and under existing conditions will continue to suffer"; that the Board would continue to need "military assistance or its equivalent"; that the local police department would not be able "to detail enough men to afford the necessary protection"; and that the situation was "intolerable." 163 F. Supp., at 20–26.

The District Court's judgment was dated June 20, 1958. The Negro respondents appealed to the Court of Appeals for the Eighth Circuit and also sought there a stay of the District Court's judgment. At the same time they filed a petition for certiorari in this Court asking us to review the District Court's judgment without awaiting the disposition of their appeal to the Court of Appeals, or of their petition to that court for a stay. That we declined to do. 357 U. S. 566. The Court of Appeals did not act on the petition for a stay, but, on August 18, 1958, after convening in special session on August 4 and hearing the appeal, reversed the District Court, 257 F. 2d 33. On August 21, 1958, the Court of Appeals stayed its mandate

14

to permit the School Board to petition this Court for certiorari. Pending the filing of the School Board's petition for certiorari, the Negro respondents, on August 23, 1958, applied to MR. JUSTICE WHITTAKER, as Circuit Justice for the Eighth Circuit, to stay the order of the Court of Appeals withholding its own mandate and also to stay the District Court's judgment. In view of the nature of the motions, he referred them to the entire Court. Recognizing the vital importance of a decision of the issues in time to permit arrangements to be made for the 1958–1959 school year, see *Aaron* v. *Cooper,* 357 U. S. 566, 567, we convened in Special Term on August 28, 1958, and heard oral argument on the respondents' motions, and also argument of the Solicitor General who, by invitation, appeared for the United States as *amicus curiae,* and asserted that the Court of Appeals' judgment was clearly correct on the merits, and urged that we vacate its stay forthwith. Finding that respondents' application necessarily involved consideration of the merits of the litigation, we entered an order which deferred decision upon the motions pending the disposition of the School Board's petition for certiorari, and fixed September 8, 1958, as the day on or before which such petition might be filed, and September 11, 1958, for oral argument upon the petition. The petition for certiorari, duly filed, was granted in open Court on September 11, 1958, *post,* p. 29, and further arguments were had, the Solicitor General again urging the correctness of the judgment of the Court of Appeals. On September 12, 1958, as already mentioned, we unanimously affirmed the judgment of the Court of Appeals in the *per curiam* opinion set forth in the margin at the outset of this opinion, *ante,* p. 5.

In affirming the judgment of the Court of Appeals which reversed the District Court we have accepted without reservation the position of the School Board, the

Superintendent of Schools, and their counsel that they displayed entire good faith in the conduct of these proceedings and in dealing with the unfortunate and distressing sequence of events which has been outlined. We likewise have accepted the findings of the District Court as to the conditions at Central High School during the 1957–1958 school year, and also the findings that the educational progress of all the students, white and colored, of that school has suffered and will continue to suffer if the conditions which prevailed last year are permitted to continue.

The significance of these findings, however, is to be considered in light of the fact, indisputably revealed by the record before us, that the conditions they depict are directly traceable to the actions of legislators and executive officials of the State of Arkansas, taken in their official capacities, which reflect their own determination to resist this Court's decision in the *Brown* case and which have brought about violent resistance to that decision in Arkansas. In its petition for certiorari filed in this Court, the School Board itself describes the situation in this language: "The legislative, executive, and judicial departments of the state government opposed the desegregation of Little Rock schools by enacting laws, calling out troops, making statements villifying federal law and federal courts, and failing to utilize state law enforcement agencies and judicial processes to maintain public peace."

One may well sympathize with the position of the Board in the face of the frustrating conditions which have confronted it, but, regardless of the Board's good faith, the actions of the other state agencies responsible for those conditions compel us to reject the Board's legal position. Had Central High School been under the direct management of the State itself, it could hardly be sug-

gested that those immediately in charge of the school should be heard to assert their own good faith as a legal excuse for delay in implementing the constitutional rights of these respondents, when vindication of those rights was rendered difficult or impossible by the actions of other state officials. The situation here is in no different posture because the members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State.

The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: "It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." *Buchanan* v. *Warley,* 245 U. S. 60, 81. Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights. The record before us clearly establishes that the growth of the Board's difficulties to a magnitude beyond its unaided power to control is the product of state action. Those difficulties, as counsel for the Board forthrightly conceded on the oral argument in this Court, can also be brought under control by state action.

The controlling legal principles are plain. The command of the Fourteenth Amendment is that no "State" shall deny to any person within its jurisdiction the equal protection of the laws. "A State acts by its legislative, its executive, or its judicial authorities. It can act in no

other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning." *Ex parte Virginia*, 100 U. S. 339, 347. Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, see *Virginia* v. *Rives*, 100 U. S. 313; *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia*, 353 U. S. 230; *Shelley* v. *Kraemer*, 334 U. S. 1; or whatever the guise in which it is taken, see *Derrington* v. *Plummer*, 240 F. 2d 922; *Department of Conservation and Development* v. *Tate*, 231 F. 2d 615. In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously." *Smith* v. *Texas*, 311 U. S. 128, 132.

What has been said, in the light of the facts developed, is enough to dispose of the case. However, we should answer the premise of the actions of the Governor and Legislature that they are not bound by our holding in the *Brown* case. It is necessary only to recall some basic constitutional propositions which are settled doctrine.

Article VI of the Constitution makes the Constitution the "supreme Law of the Land." In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as "the fundamental and paramount law of the nation," declared in the notable case of *Marbury* v. *Madison,* 1 Cranch 137, 177, that "It is emphatically the province and duty of the judicial department to say what the law is." This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the *Brown* case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, "to support this Constitution." Chief Justice Taney, speaking for a unanimous Court in 1859, said that this requirement reflected the framers' "anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its ⁰authority, on the part of a State . . . ." *Ableman* v. *Booth,* 21 How. 506, 524.

No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. Chief Justice Marshall spoke for a unanimous Court in saying that: "If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery . . . ." *United States* v. *Peters,* 5 Cranch 115, 136. A Governor who asserts a

power to nullify a federal court order is similarly re-
strained. If he had such power, said Chief Justice Hughes,
in 1932, also for a unanimous Court, "it is manifest that
the fiat of a state Governor, and not the Constitution of
the United States, would be the supreme law of the land;
that the restrictions of the Federal Constitution upon
the exercise of state power would be but impotent
phrases . . . ." *Sterling* v. *Constantin,* 287 U. S. 378,
397–398.

It is, of course, quite true that the responsibility for
public education is primarily the concern of the States,
but it is equally true that such responsibilities, like all
other state activity, must be exercised consistently with
federal constitutional requirements as they apply to
state action. The Constitution created a government
dedicated to equal justice under law. The Fourteenth
Amendment embodied and emphasized that ideal.
State support of segregated schools through any arrange-
ment, management, funds, or property cannot be squared
with the Amendment's command that no State shall deny
to any person within its jurisdiction the equal protection
of the laws. The right of a student not to be segregated
on racial grounds in schools so maintained is indeed so
fundamental and pervasive that it is embraced in the
concept of due process of law. *Bolling* v. *Sharpe,* 347
U. S. 497. The basic decision in *Brown* was unanimously
reached by this Court only after the case had been briefed
and twice argued and the issues had been given the most
serious consideration. Since the first *Brown* opinion three
new Justices have come to the Court. They are at one
with the Justices still on the Court who participated in
that basic decision as to its correctness, and that deci-
sion is now unanimously reaffirmed. The principles
announced in that decision and the obedience of the States
to them, according to the command of the Constitution,

are indispensable for the protection of the freedoms guaranteed by our fundamental charter for all of us. Our constitutional ideal of equal justice under law is thus made a living truth.

Concurring opinion of MR. JUSTICE FRANKFURTER.*

While unreservedly participating with my brethren in our joint opinion, I deem it appropriate also to deal individually with the great issue here at stake.

By working together, by sharing in a common effort, men of different minds and tempers, even if they do not reach agreement, acquire understanding and thereby tolerance of their differences. This process was under way in Little Rock. The detailed plan formulated by the Little Rock School Board, in the light of local circumstances, had been approved by the United States District Court in Arkansas as satisfying the requirements of this Court's decree in *Brown* v. *Board of Education*, 349 U. S. 294. The Little Rock School Board had embarked on an educational effort "to obtain public acceptance" of its plan. Thus the process of the community's accommodation to new demands of law upon it, the development of habits of acceptance of the right of colored children to the equal protection of the laws guaranteed by the Constitution, had peacefully and promisingly begun. The condition in Little Rock before this process was forcibly impeded by those in control of the government of Arkansas was thus described by the District Court, and these findings of fact have not been controverted: ·

"14. Up to this time, no crowds had gathered about Central High School and no acts of violence or threats of violence in connection with the carrying out of the plan had occurred. Nevertheless, out of an abundance of caution, the school authorities had

*[NOTE: This opinion was filed October 6, 1958.]

frequently conferred with the Mayor and Chief of Police of Little Rock about taking appropriate steps by the Little Rock police to prevent any possible disturbances or acts of violence in connection with the attendance of the 9 colored students at Central High School. The Mayor considered that the Little Rock police force could adequately cope with any incidents which might arise at the opening of school. The Mayor, the Chief of Police, and the school authorities made no request to the Governor or any representative of his for State assistance in maintaining peace and order at Central High School. Neither the Governor nor any other official of the State government consulted with the Little Rock authorities about whether the Little Rock police were prepared to cope with any incidents which might arise at the school, about any need for State assistance in maintaining peace and order, or about stationing the Arkansas National Guard at Central High School." 156 F. Supp. 220, 225.

All this was disrupted by the introduction of the state militia and by other obstructive measures taken by the State. The illegality of these interferences with the constitutional right of Negro children qualified to enter the Central High School is unaffected by whatever action or non-action the Federal Government had seen fit to take. Nor is it neutralized by the undoubted good faith of the Little Rock School Board in endeavoring to discharge its constitutional duty.

The use of force to further obedience to law is in any event a last resort and one not congenial to the spirit of our Nation. But the tragic aspect of this disruptive tactic was that the power of the State was used not to sustain law but as an instrument for thwarting law. The State of Arkansas is thus responsible for disabling one

of its subordinate agencies, the Little Rock School Board, from peacefully carrying out the Board's and the State's constitutional duty. Accordingly, while Arkansas is not a formal party in these proceedings and a decree cannot go against the State, it is legally and morally before the Court.

We are now asked to hold that the illegal, forcible interference by the State of Arkansas with the continuance of what the Constitution commands, and the consequences in disorder that it entrained, should be recognized as justification for undoing what the School Board had formulated, what the District Court in 1955 had directed to be carried out, and what was in process of obedience. No explanation that may be offered in support of such a request can obscure the inescapable meaning that law should bow to force. To yield to such a claim would be to enthrone official lawlessness, and lawlessness if not checked is the precursor of anarchy. On the few tragic occasions in the history of the Nation, North and South, when law was forcibly resisted or systematically evaded, it has signalled the breakdown of constitutional processes of government on which ultimately rest the liberties of all. Violent resistance to law cannot be made a legal reason for its suspension without loosening the fabric of our society. What could this mean but to acknowledge that disorder under the aegis of a State has moral superiority over the law of the Constitution? For those in authority thus to defy the law of the land is profoundly subversive not only of our constitutional system but of the presuppositions of a democratic society. The State "must . . . yield to an authority that is paramount to the State." This language of command to a State is Mr. Justice Holmes', speaking for the Court that comprised Mr. Justice Van Devanter, Mr. Justice McReynolds, Mr. Justice Brandeis, Mr. Justice Sutherland,

Mr. Justice Butler, and Mr. Justice Stone. *Wisconsin* v. *Illinois*, 281 U. S. 179, 197.

When defiance of law judicially pronounced was last sought to be justified before this Court, views were expressed which are now especially relevant:

"The historic phrase 'a government of laws and not of men' epitomizes the distinguishing character of our political society. When John Adams put that phrase into the Massachusetts Declaration of Rights he was not indulging in a rhetorical flourish. He was expressing the aim of those who, with him, framed the Declaration of Independence and founded the Republic. 'A government of laws and not of men' was the rejection in positive terms of rule by fiat, whether by the fiat of governmental or private power. Every act of government may be challenged by an appeal to law, as finally pronounced by this Court. Even this Court has the last say only for a time. Being composed of fallible men, it may err. But revision of its errors must be by orderly process of law. The Court may be asked to reconsider its decisions, and this has been done successfully again and again throughout our history. Or, what this Court has deemed its duty to decide may be changed by legislation, as it often has been, and, on occasion, by constitutional amendment.

"But from their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised. 'Civilization involves subjection of force to reason, and the agency of this subjection is law.' (Pound, *The Future of Law* (1937) 47 Yale L. J. 1, 13.) The conception of a government by laws dominated the thoughts of those who founded this

Nation and designed its Constitution, although they knew as well as the belittlers of the conception that laws have to be made, interpreted and enforced by men. To that end, they set apart a body of men, who were to be the depositories of law, who by their disciplined training and character and by withdrawal from the usual temptations of private interest may reasonably be expected to be 'as free, impartial, and independent as the lot of humanity will admit.' So strongly were the framers of the Constitution bent on securing a reign of law that they endowed the judicial office with extraordinary safeguards and prestige. No one, no matter how exalted his public office or how righteous his private motive, can be judge in his own case. That is what courts are for." *United States* v. *United Mine Workers,* 330 U. S. 258, 307–309 (concurring opinion).

The duty to abstain from resistance to "the supreme Law of the Land," U. S. Const., Art. VI, ¶ 2, as declared by the organ of our Government for ascertaining it, does not require immediate approval of it nor does it deny the right of dissent. Criticism need not be stilled. Active obstruction or defiance is barred. Our kind of society cannot endure if the controlling authority of the Law as derived from the Constitution is not to be the tribunal specially charged with the duty of ascertaining and declaring what is "the supreme Law of the Land." (See President Andrew Jackson's Message to Congress of January 16, 1833, II Richardson, Messages and Papers of the Presidents (1896 ed.), 610, 623.) Particularly is this so where the declaration of what "the supreme Law" commands on an underlying moral issue is not the dubious pronouncement of a gravely divided Court but is the unanimous conclusion of a long-matured deliberative process. The Constitution is not the formulation of the

merely personal views of the members of this Court, nor can its authority be reduced to the claim that state officials are its controlling interpreters. Local customs, however hardened by time, are not decreed in heaven. Habits and feelings they engender may be counteracted and moderated. Experience attests that such local habits and feelings will yield, gradually though this be, to law and education. And educational influences are exerted not only by explicit teaching. They vigorously flow from the fruitful exercise of the responsibility of those charged with political official power and from the almost unconsciously transforming actualities of living under law.

The process of ending unconstitutional exclusion of pupils from the common school system—"common" meaning shared alike—solely because of color is no doubt not an easy, overnight task in a few States where a drastic alteration in the ways of communities is involved. Deep emotions have, no doubt, been stirred. They will not be calmed by letting violence loose—violence and defiance employed and encouraged by those upon whom the duty of law observance should have the strongest claim—nor by submitting to it under whatever guise employed. Only the constructive use of time will achieve what an advanced civilization demands and the Constitution confirms.

For carrying out the decision that color alone cannot bar a child from a public school, this Court has recognized the diversity of circumstances in local school situations. But is it a reasonable hope that the necessary endeavors for such adjustment will be furthered, that racial frictions will be ameliorated, by a reversal of the process and interrupting effective measures toward the necessary goal? The progress that has been made in respecting the constitutional rights of the Negro children, according to the graduated plan sanctioned by the two

lower courts, would have to be retraced, perhaps with even greater difficulty because of deference to forcible resistance. It would have to be retraced against the seemingly vindicated feeling of those who actively sought to block that progress. Is there not the strongest reason for concluding that to accede to the Board's request, on the basis of the circumstances that gave rise to it, for a suspension of the Board's non-segregation plan, would be but the beginning of a series of delays calculated to nullify this Court's adamant decisions in the *Brown* case that the Constitution precludes compulsory segregation based on color in state-supported schools?

That the responsibility of those who exercise power in a democratic government is not to reflect inflamed public feeling but to help form its understanding, is especially true when they are confronted with a problem like a racially discriminating public school system. This is the lesson to be drawn from the heartening experience in ending enforced racial segregation in the public schools in cities with Negro populations of large proportions. Compliance with decisions of this Court, as the constitutional organ of the supreme Law of the Land, has often, throughout our history, depended on active support by state and local authorities. It presupposes such support. To withhold it, and indeed to use political power to try to paralyze the supreme Law, precludes the maintenance of our federal system as we have known and cherished it for one hundred and seventy years.

Lincoln's appeal to "the better angels of our nature" failed to avert a fratricidal war. But the compassionate wisdom of Lincoln's First and Second Inaugurals bequeathed to the Union, cemented with blood, a moral heritage which, when drawn upon in times of stress and strife, is sure to find specific ways and means to surmount difficulties that may appear to be insurmountable.