Anthony T. LEE et al., Plaintiffs,

United States of America, Plaintiff-Intervenor and Amicus Curiae,

v.

MACON COUNTY BOARD OF EDUCATION et al., Albert P. Brewer, in his capacity as Governor of the State of Alabama, and as President of Alabama State Board of Education, Alabama State Board of Education, Ernest Stone, Secretary and Executive Officer of Alabama State Board of Education, et al., Defendants.

Civ. A. No. 604–E.

United States District Court
M. D. Alabama, E. D.

Aug. 28, 1968.

See also, 283 F.Supp. 194; D.C., 289 F.Supp. 975.

Fred D. Gray, Solomon S. Seay, Jr., Gray, Seay, Langford & Pryor, Montgomery, Ala., Jack Greenberg and Melvyn Zarr, New York City, for plaintiffs.

Stephen J. Pollak, Asst. Atty. Gen., Frank D. Allen, Jr., and Walter Gorman, Attys., Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., for the United States plaintiff-intervenor and amicus curiae.

MacDonald Gallion, Atty. Gen., and Gordon Madison, Asst. Atty. Gen., State of Alabama, Maury D. Smith, Charles Crook and Thomas W. Thagard, Jr., Goodwyn, Smith & Bowman, Montgomery, Ala., for defendants.

Before RIVES, Circuit Judge, and JOHNSON, District Judge.

## MEMORANDUM OPINION

### PER CURIAM.

This proceeding, the latest in a long series in this case, arises out of motions for further relief designed to supplement this Court's opinion and order of March 22, 1967. Lee v. Macon County Board of Education, D.C., 267 F.Supp. 458. The present motions filed by the plaintiffs and the United States ask this Court to require the defendants State Board of Education and State Superintendent of Education to exercise their

supervisory authority over 76 of the county and city school systems that were required by the order of March 22, 1967, to take additional affirmative action to disestablish dual public school operations to the extent that they are based upon race. This case has a long history; both the factual history and the numerous legal proceedings were detailed by this Court in its opinion that accompanied the order of March 22, 1967. More specifically, the motions now presented seek to have this Court require the 76 county and city systems enumerated therein to take action pursuant to the principles enunciated by the Supreme Court of the United States in Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, designed to bring about a more prompt disestablishment of these dual public school systems based upon race. Generally, the plaintiffs and the United States ask this Court to require the defendants, through the exercise of their supervisory powers over the several Boards of Education here involved, to abandon the "freedom-of-choice" method of desegregating their public school systems and to put into effect a system of assigning students, both white and Negro, through the use of zoning, consolidation, or pairing of the schools.

This submission is upon the pleadings, the various reports that have been filed as required by the decree of March 22, 1967, the testimony taken by deposition of over forty local superintendents of education, and the depositions of the State Superintendent of Education and the Governor of the State of Alabama. The parties, in support of and in opposition to the motions, have prepared for this Court from this vast volume of evidence statistical charts, maps, and other pertinent data; the parties have also assisted the Court by preparing and presenting comprehensive and excellently written briefs.

■ The 1968–1969 school year will be the second year for the operation of the freedom-of-choice plans filed with this Court by the several systems here involved, pursuant to the decree of March 22, 1967. Most, if not all, of these school systems were operating under some type of a "freedom-of-choice" plan prior to the entry of the March, 1967, decree. Many of the systems continue to operate all-Negro schools, and, as a matter of fact, for the coming school year these systems plan to operate a total of 267 all-Negro schools serving approximately 102,641 children. During the 1966–1967 school year, 97.-5% of the Negro students in the 76 systems here involved attended all-Negro schools. Based upon the choice-period report filed with this Court for the 1968–1969 school year, approximately 91% of the Negro students in the 76 systems again plan to attend all-Negro schools. The other side of the picture reflects that commencing immediately after the entry of the order of March 22, 1967, the State Superintendent of Education, as he was required to do by the court order, secured from each of the school systems here involved and from approximately 24 systems not here involved acceptable freedom-of-choice plans for the desegregation of their public school systems. These plans comport in every respect with the requirements of United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966), affirmed on rehearing en banc, 380 F.2d 385 (5th Cir. 1967). The defendants have required each of said school systems to adhere closely to the provisions of the plan adopted. Considerable progress has been made by the several systems here involved in the area of equalization of facilities and the closing of sub-standard Negro schools. One hundred fifty-one such schools have been closed entirely since the entry of this Court's decree. Additionally, numerous grades of other such schools have also been eliminated. As the decree required, the several systems filed with the State Superintendent of Education in May, 1967, plans for desegregating their faculties and staffs. A teacher placement service has been set up through the office of the State Superin-

tendent of Education to assist the several local Boards in the hiring or assignment of teachers designed to comply with the faculty desegregation provision of the court decree. Teacher institutes and in-service training programs have been conducted on a desegregated basis. In 1967–1968, in the 99 school systems covered by the March 22, 1967, decree, approximately 590 Negro teachers were assigned to formerly white schools. For the year 1968–1969 approximately 740 such assignments are projected. In these systems, in the school year 1967–1968 over 400 white teachers were assigned to formerly Negro schools, and for the school year 1968–1969, over 500 such assignments are projected. As required by the decree, the superintendents of education of the 76 school systems now involved in this proceeding have established nondiscriminatory criteria governing the availability of bus transportation, and standards were promulgated designed to see that such criteria were met. All reports required by the court order have been submitted within the time specified. From its long experience in public school desegregation cases and the attendant problems, this Court is acutely conscious that a vital element necessary to the successful implementation of any school desegregation plan is the attitude of and the performance demonstrated by the State Superintendent of Education and the Governor of the State, who also acts as ex officio chairman of the State Board of Education. This Court is impressed that the present State Superintendent of Education and the present Governor of the State of Alabama are approaching the problem of public school desegregation in good faith and have honestly and fairly discharged, and intend to continue to discharge, the obligations imposed upon them by the law.

In the *New Kent County, Virginia* case, the Supreme Court of the United States held that, *under the facts there presented*, "freedom of choice" was not a satisfactory method of pupil assignment. The Supreme Court in that case recognized the extreme complexities involved and stated, "[t]here is no universal answer to complex problems of desegregation * * *." The Court then determined that in New Kent County, Virginia, freedom of choice was an impermissible method of student assignment "if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system * * *." This basic principle was recognized by this Court in its order of March 22, 1967, 267 F.Supp. 458, 478, and it was specifically noted that the use of freedom-of-choice plans was being approved "for the time being." This Court warned that such a plan "is not an end in itself; it is but a means to an end," and recognized that "[i]t may well be that the freedom of choice method of desegregation will not fully and completely disestablish the dual public school system based upon race." At the conclusion of our discussion of freedom of choice as one method of desegregating dual public school systems, we stated:

> "In short, the measure of a freedom-of-choice plan—or, for that matter, any school plan designed to eliminate discrimination based upon race —is whether it is effective. If the plan does not work, then this Court, as well as the State of Alabama school officials—both state and local—is under a constitutional obligation to find some other method to insure that the dual school system of public education based upon race is eliminated. In adopting this plan, therefore, we stress again that it may be only an interim plan. Its success will be periodically judged in the light of the criteria herein set out. For this and all other purposes, jurisdiction will be retained."

On August 20, 1968, in an opinion yet unreported in the case of Adams v. Matthews, 403 F.2d 181, the United States Court of Appeals for the Fifth Circuit interpreted the mandate of the Supreme Court in the *New Kent County, Virginia*

case. This interpretation does not materially change the basic legal principles that control the local Boards of Education and the district courts that are attempting to cope with these problems.

■ With these legal principles and facts now before us, we find that freedom of choice, as a method for desegregating the 76 public school systems now involved in this proceeding, has not yet completely disestablished the dual school systems based upon race. However, for the time being, the members of this Court are unanimous in the belief that the freedom-of-choice method is the most feasible method to pursue. It is not considered advisable at this time to enter any order which requires the assignment of students through the pairing, the consolidation, or the establishment of attendance zones in any of the public school systems now under the supervision of the State Superintendent of Education by virtue of the opinion and decree of this Court entered March 22, 1967. There simply are no other or more effective means reasonably available *at this time* that promise a speedier conversion to a unitary system. The facts that the Supreme Court in the *New Kent County, Virginia* case evidently felt required the entry of an order for the abandonment of "freedom of choice" and the facts that are now before this Court are vastly different. A vital difference (other than those already mentioned) is the good faith approach to these problems by the State Superintendent of Education. In this regard, the Supreme Court stated:

> "Where the court finds the board to be acting in good faith and the [freedom-of-choice] plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. * * "
>
> * * * * * *
>
> "Where [freedom-of-choice] offers real promise of aiding a desegregation program * * * there might be no objection to allowing such a device to prove itself in operation. * * * "

■ Since March, 1967, there have been several significant developments in the law relating to the desegregation of the public schools and the public school systems. As stated, the cases of *New Kent County, Virginia*, supra, and Adams v. Matthews, supra, while significant, did not change the basic principles upon which this Court's March 22, 1967, decree was based. We then recognized and continue to recognize that the courts and the school boards, in carrying out their constitutional duties of desegregating the public school systems that are based upon race, cannot yield in the exercise of that duty because of the possibility that white students will flee the public school system, or that the public will discontinue its financial support of its public school systems. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L. Ed.2d 5; Griffin v. County School Board of Prince Edward County, 377 U. S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422. No consideration of these factors has been given by this Court in arriving at its conclusion that, for the time being, in the 76 school systems here involved the freedom-of-choice method as approved by this Court on March 22, 1967, is the most feasible and practical one for solving the problems with which we are now dealing.

■■ The evidence in this case does impress us, however, that, as to the implementation of teacher desegregation, the closing of Negro schools that have fewer students than required under the minimum-student standards of the State Department of Education, and the closing of some schools—the continued operation of which will have the inevitable effect of thwarting the effective desegregation of these public school systems through the use of the freedom-of-choice plan—more specific directions must be given the defendants and the local School Boards that are the subject of the motions for further relief. Accordingly, this Court has painstakingly analyzed the performance of the 76 school

systems here involved in these areas. This performance has been studied as to each of the schools in each of these systems. The study reflects that faculty desegregation for the school year 1968–1969 should be, at a minimum, upon the basis recently approved by the United States Court of Appeals for the Fifth Circuit in Montgomery County Board of Education v. Carr, 400 F.2d 1. In the *Montgomery County Board of Education* case, it was determined that an appropriate faculty desegregation ratio for the 1968–1969 school year was one in six. Specific minimum requirements for faculty desegregation in many of the schools in the 76 systems whose efforts are now challenged in this proceeding will be set forth in the appendix * to the decree to be entered in this case. It should be kept in mind by the School Boards here concerned that they have the legal duty to achieve faculty desegregation by compelling faculty assignment if voluntary placement is not effective. United States v. Jefferson County Board of Education, supra; Carr v. Montgomery County Board of Education, supra. The United States Court of Appeals for the Fifth Circuit in the *Montgomery County Board of Education* case emphasized this duty as follows:

"The question of whether a school board is obligated to assign teachers to schools where their race is in the minority when efforts to persuade teachers voluntarily to accept such positions fail, has recently been before this court. United States v. Board of Educ. of City of Bessemer, supra, 372 F.2d 836. That opinion answers the above question with an emphatic *yes*.

We quote:

'The School Boards do not meet their duty by soliciting volunteers. For the fact remains that the "responsibility for faculty desegregation, just as the responsibility of student desegregation, lies ultimately with the board, not the teachers."

Davis 'v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690. So there will be no mistake about it we spell out that *Jefferson* stands for the proposition that there is an affirmative duty on the part of the School Boards to do everything—the word is everything—within their power to meet the decree-imposed complete desegregation of faculties. It is not, it cannot be, left to the voluntariness of teacher applicants or transfers.' "

The appendix will also set forth various schools in several of the systems that either have fewer students than required under the minimum-student standards set by the State of Alabama Department of Education, or the continued operation of which will have the inevitable effect of thwarting the success of the freedom-of-choice plans for desegregating the school systems; these schools and/or grades will be closed as indicated. The defendants, and particularly the State Superintendent of Education in the exercise of his supervisory powers over the local school systems, will have the responsibility of seeing that these minimum faculty desegregation requirements are fully, timely and completely implemented and of seeing that the schools designated to be closed are no longer operated as a part of the public school system in the State of Alabama. The State Superintendent of Education will require the local Boards to report to him concerning their implementation of that part of this order and he will, in turn, report to this Court as to the performance of each of the systems as herein directed. This affirmative action now directed is considered the minimum necessary for each public school system indicated to take in order to justify the continued use of the freedom-of-choice method for disestablishing its dual school system.

An order will be entered denying the motion of the plaintiffs and the motion

* Appendix omitted.

of the United States to the extent that those motions ask this Court to order the abandonment of the freedom-of-choice method for desegregating the 76 school systems now involved. The order will also direct the closing of certain schools and grades and the acceleration of faculty desegregation in certain schools.

Jurisdiction of this case will be specifically retained.