May 25, 1979

## 79-37  MEMORANDUM OPINION FOR THE SECRETARY OF ENERGY

**Emergency Petroleum Allocation Act of 1973 (15 U.S.C. § 751)—The President—Constitutional Law (Article II, Section 2, Clause 2)—Delegation of Authority to State Governors in End-user Gasoline Allocation Program**

This responds to your request for our opinion regarding several questions arising from a proposed delegation of powers under the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 *et seq.*: First, whether the President may constitutionally delegate powers under EPAA to the Governors of the several States and whether the Governors can exercise these powers in the absence of any State enabling legislation or in the presence of State legislation affirmatively prohibiting the exercise of such powers; second, whether the substantive powers proposed to be delegated to the Governors are within the scope of power delegated to the President by EPAA. We conclude that delegation of specific powers to the Governors on a permissive basis would clearly be authorized except in situations in which constitutional provisions of the State prevented the exercise of such Federal powers by the Governor.

### I. The Constitutionality of Delegating Federal Power to a Governor

The delegation of power by Executive order under the EPAA to the Governors of the several States raises two distinct constitutional issues. First, whether a Governor may constitutionally be delegated the power under a Federal statute in order to implement and enforce Federal law. Second, whether such a delegation is consistent with the "state sovereignty" values embodied in the Tenth Amendment in the absence of State legislation supportive of the delegations or in the presence of prohibitory State statutory or constitutional provisions.

The Governors of the several States may be delegated the power to

implement and enforce Federal substantive law. It is settled that State officers are under a constitutional obligation to abide by Federal law, *see, Cooper* v. *Aaron,* 358 U.S. 1 (1958), and that at least some Federal power may be delegated to private citizens, *see, Currin* v. *Wallace,* 306 U.S. 1 (1939). In addition, so long as the President retains the authority to withdraw power once delegated, as he has done here, his prerogatives under Article II, § 2, Cl. 2, to select and control those who will implement Federal law is preserved.[1] The only substantial question raised by the proposed delegation relates to the impact it might have on the sovereign status of the States in our federal system. *Cf., National League of Cities* v. *Usery,* 426 U.S. 833 (1976).

The salient feature of the delegation in regard to the Tenth Amendment is that each Governor will be free to decline the delegation for any or no reason at all. Thus, unlike the situation initially presented to the Supreme Court in *Environmental Protection Agency* v. *Brown,* 431 U.S. 99 (1977), the executive branch of any State is completely free to accept or reject the responsibilities attendant to any delegation of Federal power by the President. Given the permissive nature of the delegation, we do not believe that the concerns expressed by the several Courts of Appeals regarding the Tenth Amendment implications of the Clean Air Act and that Act's imposition of certain duties on the States are present here. *See, e.g., Brown* v. *Environmental Protection Agency,* 521 F. (2d) 827, 837–42, (9th Cir. 1975), *judgment vacated,* 431 U.S. 99 (1977). There, the Ninth Circuit suggested quite strongly that a Federal statute requiring a State to expend State funds and utilize State personnel to enforce certain provisions of the Clean Air Act would present substantial Tenth Amendment problems. We do not believe that the voluntary assumption of such Federal responsibilities by State officers stands on the same footing as the mandatory requirements of the regulations issued by the Environmental Protection Agency pursuant to the Clean Air Act.[2] Indeed, we believe there is a constitutional presumption that a State officer will enforce Federal laws when called upon to do so, *see, Cooper* v. *Aaron, supra.* Thus, at least where no State statutory or constitutional law is to the contrary, the chief executive of a State may be delegated the power to exercise the contemplated functions under § 5(b) of the EPAA.

Where, however, the executive authority of a State is explicitly prohibited by State law from assuming such functions, we doubt that a

---

[1] Under 15 U.S.C. § 1827(a), the Secretary of Agriculture was empowered in 1970 "to utilize the officers and employees of any State, with its consent" in the carrying out of a Federal program for the protection of horses. Although such provisions are relatively novel, their usage has now been accepted for at least a decade by Congress and the executive branch.

[2] We note that prior to the Supreme Court's decision in *Brown,* the Environmental Protection Agency conceded that the mandatory provisions of its regulations for affirmative State action were invalid under the Clean Air Act. For this reason, the Supreme Court did not reach the merits of the statutory or constitutional arguments raised by several States quite successfully in the decisions considered by the Court in *Brown.*

Governor can accept a delegation to perform these Federal functions. The threshold inquiry is whether Congress would have intended State law to be preempted by the EPAA. Section 6(b) of that Act, 15 U.S.C. § 755(b), deals specifically with the subject of preemption, but does not suggest a congressional intent to preempt the kind of State law that would be involved here. Because the control of a State's executive branch by its legislature, including the devotion of State officers to duties other than those prescribed by the State legislatures, appears to us to be a fundamental aspect of State sovereignty under the Tenth Amendment. We believe that EPAA should not be read, and probably cannot be read, to effect such preemption. We think that the specificity of the preemption provision contained in the EPAA, which clearly does not contemplate the kind of preemption involved here, coupled with the substantial constitutional question that would be presented, were the EPAA read to preempt such State law, would be decisive on this point.[3]

We therefore conclude that although power under the EPAA may be delegated by Executive order to Governors on a permissive basis, such a delegation could not be effected in contravention of State law.

## II. The Power to Require End-user Allocation of Gasoline Under EPAA

Under the proposed Executive order, a Governor would be empowered to require motor-gasoline retail sales outlets in his State or a locality thereof to supply gasoline to vehicles on an "odd-even plate number basis," to require purchasers of gasoline to purchase a specified minimum amount of gasoline, and finally to require retailers to be open or closed for the sale of gasoline at specified times of the day or on specified days. The question is whether EPAA authorizes the type of such end-user allocation controls.

This question can be subdivided into two parts: First, whether EPAA authorizes the application of mandatory allocation measures applicable to end-users; second, if EPAA does authorize these, whether it authorizes the specific type of powers proposed to be delegated.

### End-user Allocation

Under § 4 of EPAA, 15 U.S.C. § 753, the President was directed to

---

[3] The substantiality of the constitutional question presented is apparent under all the Courts of Appeals decisions consolidated for review in the Supreme Court in *Environmental Protection Agency* v. *Brown, supra.* Certainly, the requirement that the Governor of a State perform Federal duties is one that could detract substantially from his ability to perform State duties imposed on him by State law. Indeed, it is difficult to conceive of a more significant infringement on State authority than to conscript the Governor of a State, even a willing Governor, into the Federal service in contravention of State law reserving the services of the Governor to the people of his State.

establish a "mandatory allocation" program by regulation. As explained in the Conference Report on the Act:

> The mandatory allocation program will operate to compel the allocation of product throughout the various levels of the petroleum market. It may be necessary, in selective cases, to compel the allocation of product to particular end-users, such as hospitals, units of government, or persons engaged in energy production and transportation; but it is not generally expected that the regulation promulgated by the President will be burdened with the complexities of assigning fuels to users unless such assignment is necessary to carry out the purposes of the Act. When required, however, it is intended that the President would have full authority under this Act to identify permissible uses of covered fuels and to restrict the amounts which may be made available to such uses.[4]

In 1974, the Federal Energy Administration (now the Federal Energy Regulatory Commission), exercising the power granted by § 4 of EPAA, promulgated regulations specifically covering the allocation of certain petroleum products to end-users. *See* 10 CFR §§ 211.10–211.17, reprinted in 39 F.R. 35511–19 (Oct. 1, 1974). Thus, from an early date the agency charged with exercising the power of allocation clearly read that statute as authorizing allocation of various petroleum products covered by the Act to end-users. This evidence is significant because it is a familiar rule of statutory construction that an agency's contemporaneous interpretation of a statute is normally given great weight. *See, Maynard* v. *Elliott,* 283 U.S. 273 (1931). In connection with its consideration of what ultimately became the Energy Policy and Conservation Act, 42 U.S.C. §§ 6261 *et seq.,* the Congress reviewed in some detail the allocation regulations that had been issued by the Federal Energy Administration. *See* H. Rept. 94–340, 94th Cong., 1st sess., 65–69 and 185–203 (1975). The consequences of this review were the reenactment of EPAA and the addition to it of additional tools to be used by the President to deal with energy allocation and shortages. Under such circumstances, the contemporaneous interpretation of the EPAA in 1974 is "presumptively the correct interpretation of the law." *See* 2A Sutherland, *Statutory Construction* § 49.09 (4th ed. 1973); *Cammarano* v. *United States,* 358 U.S. 498, 508–09 (1959). We believe that the prior interpretations of the EPAA would be viewed as correct interpretations and clearly within the scope of EPAA.[5]

## Specific End-user Controls

In its consideration of the proposed EPCA in 1975, the House

---

[4] H. Rept. 93–628, 93rd Cong., 1st sess., 13 (1973).

[5] Although we believe that § 4 of EPAA is adequate support for the proposed Executive order, we would additionally note that §§ 15 and 16 of EPAA, added to EPAA by the enactment of the EPCA in 1975, would also appear to provide authority.

committee on Interstate and Foreign commerce expressly noted that measures instituted largely by the States on their own initiative during the 1973–1974 oil embargo had been successful. More particularly, the Committee Report noted that alternate day of the week purchases, requirements that motorists have less than one-half a tank of gas prior to purchase, and controlled gasoline station business hours had been very effective in dealing with that shortage. *Id.,* at 64. The response of Congress in the EPCA was an amendment to EPAA, adding to that latter Act new §§ 11 and 12, 15 U.S.C. §§ 760, 760a. Under § 11, the President was to review the prior regulations issued pursuant to § 4 of EPAA and to amend them under specified circumstances. Under § 12, the criteria for amendment were established. Basically, it was required that "the regulation, as amended, [must provide] for the attainment, to the maximum extent practicable of the objectives stated in § 4 of the Act."

This language, coupled with the broad authority conferred on the President by § 4 as explained by the language quoted above from the conference report, provides substantial support for a determination that the controls that would be authorized by the proposed Executive order were "necessary" to carry out the purposes of EPAA.[6]

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[6] The Temporary Emergency court of Appeals suggested in dictum that § 4 would provide a basis for a regulation that would have provided for preferential treatment by gasoline retailers for identifiable commercial customers. *See, Reeves* v. *Simon,* 507 F. (2d) 455, 461 (1974), cert. denied, 420 U.S. 991 (1975). The *Reeves* case is necessarily grounded on the proposition that EPAA permits the regulation of gasoline retailers as part of a program of end-user allocation.