In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2707

Reid L., et al.,

Plaintiffs-Appellants,

v.

Illinois State Board of Education,
Glenn W. McGee, in his capacity as
Illinois State Superintendent of
Education, and Corey H., et al.,

Defendants-Appellees.

No. 01-3432

Corey H., et al.,

Plaintiffs-Appellees,

v.

Board of Education of the City of
Chicago, et al.,

Defendants-Appellees,

Appeal of:  Reid L., et al.,

Prospective Intervenors.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 01 C 4180, 92 C 3409--Robert W. Gettleman, Judge.

Argued September 25, 2001 and February 15, 2002--
Decided May 13, 2002


   Before Rovner, Diane P. Wood, and Evans,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  In these
two cases, which we have consolidated
solely for the purpose of issuing our
opinion, certain parties are seeking to
enjoin the Illinois State Board of
Education (ISBE) from promulgating and
implementing new rules on special
education teacher certification. The Reid
L. parties are minor children enrolled in
Illinois public schools outside of
Chicago; they all have been classified by
their respective school districts as

having disabilities, within the meaning of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. sec. 1400 et seq. The Corey H. parties are their counterparts within the City of Chicago.

After a great deal of litigation, which we describe below, the district court entered a remedial decree designed to bring the Illinois system of special education teacher certification into compliance with various requirements of the IDEA, particularly its directive that students be educated in the least restrictive environment, see 20 U.S.C. sec. 1412(a)(5). The two appeals before us represent the efforts of the Reid L. parties to prevent the new rules developed pursuant to the district court's order from entering into effect (or, if necessary, to roll them back). The Reid L. appeal (No. 01-2707) arises from the district court's denial of a preliminary injunction that would have stopped the rules from going into effect on July 1, 2001. The Reid L. parties and certain teachers also tried to intervene directly in the Corey H. litigation; the Corey H. appeal (No. 01-3432) is brought by the would-be intervenors to challenge the denial of their motions to intervene. We conclude that the district court did not err either in refusing to enjoin the new rules or in denying the Reid L. parties' attempt to intervene in the Corey H. case; we therefore affirm.

I

In order to place the present dispute in context, we must look back a quarter of a century to the way in which children with disabilities have received their education in the Chicago Public Schools. In 1975, Congress passed the Education for All Handicapped Children Act, Pub. L. 94-142 (Nov. 29, 1975), which for the first time required that children with disabilities be educated with the least restrictive accommodations possible. In 1990, Congress replaced that statute with the IDEA. In the meantime, however, Chicago had done little to change the way in which it handled the education of the affected students. Briefly put, it relied heavily on categorization of both students and teachers, and had little flexibility for cross-categorical or individualized arrangements.

On May 22, 1992, the Corey H. plaintiffs and their parents, acting on behalf of themselves and all similarly situated disabled students attending the Chicago Public Schools (CPS), filed an action in federal court against the Board of Education of the City of Chicago, the Superintendent of the Board, and the Illinois State Board of Education, claiming that the defendants had failed to provide students with disabilities who attended the CPS with a free appropriate public education in the least restrictive environment, as mandated by the IDEA, sec.sec. 1412(a)(1) and (5). The Chicago Board and the ISBE opposed class certification, but the district court disagreed and certified the Corey H. class on February 1, 1993, at the same time denying the defendants' motion to dismiss.

Four years later, on February 10, 1997, the Corey H. plaintiffs filed a second amended complaint, in which they alleged that the ISBE violated the IDEA by failing to ensure that an adequate supply of qualified special education teachers and related personnel was available and properly trained. On July 29, 1997, joint experts hired by all the parties in Corey H. issued a report. Their report concluded that the current certification system for special education teachers was in part responsible for the failures in the education of the affected children. That system employed eight disability categories: learning disabilities, social/emotional disorders, educable mentally handicapped, trainable mentally handicapped, physically handicapped, blind/visually impaired, deaf/hard of hearing, and speech/ language handicapped. The report described this system as "archaic" and asserted that "the current certification system results in categorical service delivery, limits the way staff can be used and limits involvement in general education. . . ." The experts reported also that the certification system improperly supported the segregation of students with disabilities according to their disability category and unlawfully limited the educational environment in which they were placed.

In September 1997, the Corey H. plaintiffs and the Chicago Board reached a settlement, which the district court

preliminarily approved on October 23, 1997. The district court ordered the parties to provide notice of the settlement, and it then held a fairness hearing on January 16, 1998. That settlement was finally approved on that day, and its terms are not part of the present controversy.

What continued after that settlement was the question of the ISBE's liability. As to that part of the case, the Corey H. parties and the ISBE proceeded to trial on October 20, 1997. See Corey H. v. Board of Education of the City of Chicago, 995 F. Supp. 900, 903 (N.D. Ill. 1998). On February 19, 1998, the district court found in favor of the plaintiffs on the liability question, holding that the ISBE had violated the least restrictive environment mandate of the IDEA. Id. The court's findings specifically singled out the categorical system of special education teacher certification as a contributing factor to the violation. Accordingly, the court ordered the ISBE to develop rules and regulations for teacher certification that would bring the state into compliance with the statute.

Rather than appealing the liability decision, the ISBE and the plaintiff parties entered into settlement discussions with respect to remedies. Their efforts bore fruit a year later, and on March 24, 1999, the district court preliminarily approved the proposed settlement, and ordered notice and a public hearing which was scheduled for June 18, 1999. The notice was disseminated widely throughout both Chicago and the state; it elicited hundreds of written comments on the settlement. Importantly, people from throughout the State of Illinois responded, many with objections. Among the responders was the Illinois Education Association (IEA), the principal teachers' organization in Illinois, which submitted a letter through its president, Bob Haisman.

Although the Corey H. litigation concerned only the Chicago public schools, it was obvious that the teacher certification issue would affect the entire state. Illinois has long since done away with separate teacher certification standards for Chicago and

the rest of the state, and thus to fix matters for Chicago inevitably meant a change in statewide standards. See 105 ILCS 5/14-9.01 ("No person shall be employed to teach any class or program authorized by this Article [Children with Disabilities] . . . unless he has had such special training as the State Board of Education may require."). At the start of the hearing, in fact, the district court advised the participants that if they had wished to have a more formal voice in the content of the settlement agreement, they should have moved earlier either to intervene or to submit a brief amicus curiae. Nevertheless, there was extensive testimony from interested parties.

On the same day that the fairness hearing was held, June 18, 1999, the district court entered an order approving the settlement between the Corey H. plaintiffs and the ISBE. The settlement agreement covered a number of topics, including monitoring procedures and policies, pre-school services, funding policies, and, central for present purposes, teacher certification. Instead of having the court draft the detailed remedial plan, the parties agreed that ISBE would have the primary responsibility to develop special education teacher certification rules, in cooperation with the CBE and the plaintiffs. Any such rules were subject to the court's retained jurisdiction to ensure that any plan eventually adopted was consistent with the permanent injunction the court had already entered against ISBE forbidding further violations of the IDEA. See Corey H., 995 F. Supp. at 918.

The ISBE set out to do just that. Even before the settlement agreement had been approved, in 1998, the ISBE began working with Illinois parents, advocates for students with disabilities, and educators, to revamp these teacher certification rules. It created two advisory panels, which conducted a dozen public statewide hearings on the issue. The panels also sent proposed certification standards to numerous outsiders, including teachers, universities, and professional associations, for their comments. In October 1999, the panels submitted their report to the ISBE, recommending that the

existing eight categories be reduced to five. Because opinions still conflicted so strongly on the best way to achieve the goals of the IDEA, however, the ISBE then convened another Blue Ribbon Task Force, which met in February 2000 to develop recommendations for certification of special education teachers. That task force suggested combining the five categorical certificates (learning disability, social/emotional disorder, educable mentally handicapped, trainable mentally handicapped, and physically handicapped) into two new certificates-- one for Learning Behavior Specialist Adapted Curriculum Focus, and the other for Learning Behavior Specialist Modified Curriculum Focus. In addition to these two recommendations, the IEA and the Illinois Special Education Coalition submitted a proposal recommending retention of the eight categorical certificates and adding a new cross-categorical certificate.

At this point, the ISBE realized that it was decision time. The diversity of views that were before it made it clear that the Board was not likely to find a consensus solution that made everyone happy. In coming up with its final proposal, it took a number of factors into account, including the fact that many students' disabilities touch several of the old categories, the need to train teachers properly for any new system that was implemented, the impact of any new system on the supply of special education teachers, the impact of any new system on the ability of local school districts to deliver services to disabled students, the length of time needed to implement any new system, and the effect of a new system on existing teachers. The ISBE staff accordingly developed its own option, which contemplated one certificate ("Learning Behavior Specialist 1", or LBS1) for all the former categorical certificates (learning disability, etc., as mentioned above), and separate certification for specialists in teaching students who have vision impairments, hearing impairments, or early childhood or speech/language disorder. This was the proposal the ISBE submitted for the approval of the district court.

The court had appointed a Monitor to assist it in overseeing both the Chicago Board's and the ISBE's compliance with

their respective settlement agreements. The Monitor accordingly submitted comments on the ISBE's proposed certification rules on June 22, 2000. In those comments, the Monitor suggested that the certification rules should be submitted as peremptory rules to the Joint Committee on Administrative Rules (JCAR) in the Illinois General Assembly (a legislative support services agency created under Illinois law, see 5 ILCS 100/5-90). See also 5 ILCS 100/5-50 (describing peremptory rulemaking). On September 12, 2000, the district court accepted the Monitor's recommendation and ordered the ISBE to file its proposed certification rules as peremptory rules under the Illinois Administrative Procedure Act. It concluded that this was proper because these rules were "required as a result of federal law, federal rules and regulations, [or] an order of a court," see 5 ILCS 100/5-50, not as a "consent order or other court order[ ] adopting settlements negotiated by the agency," see id. ISBE never would have taken action had it not been for the court's February 1998 decision on liability and the remedial order that followed.

On October 26, 2000, the ISBE published the certification rules under its peremptory rulemaking authority. The rules identify specific common standards that all special education teachers must master, as well as standards for those who want the LBS1 certificate. At that point, however, a tug-of-war at the state level emerged. In January 2001, JCAR suspended the rules, claiming that they constituted a serious threat to the public interest and welfare. The district court judge then met with the Corey H. parties and certain members of the Illinois General Assembly to decide what to do. These efforts at consensus also failed, however; on February 21, 2001, JCAR again announced that the rules were suspended. On February 27, 2001, exercising the power to act independently of the ISBE altogether that it had reserved in both the ruling on liability and in the settlement agreement, the court ordered the ISBE to implement the rules immediately without referral to JCAR. The Illinois 92nd General Assembly also attempted to stop the implementation of the rules, voting to continue indefinitely the suspension of the rules

and passing a joint resolution of both houses on May 31, 2001.

At the same time, the court ordered the ISBE to conduct public hearings on another set of rules, the Rules for Transition to the New Special Education Certification Structure (transition rules). The transition rules outlined the procedure for teachers holding certificates under the old system to become requalified as holders of the LBS1 certificate. Essentially, they created a three-year grace period for such teachers, giving them time to acquire any additional training they might need. During that interim period, no Illinois school district would be permitted to assign a transitional teacher to teach students outside his or her prior categorical certificate. As ordered by the court, the ISBE held public hearings on the transition rules in March 2001. It received extensive comments. As a result of those comments, ISBE proposed splitting the LBS1 certificate into two (general curriculum and differentiated curriculum), but the district court refused to do so.

On June 28, 2001, the court ordered the ISBE to implement the transition rules. We now turn back to the parties who are attempting to challenge these results from the Corey H. case: the plaintiffs in the Reid L. litigation (who are also the proposed intervenors in the Corey H. case, which allows us to refer to them simply as the Reid L. parties). On May 7, 2000, the Reid L. parties (a group ofspecial education teachers and students who live outside the boundaries of the Chicago Public School district, and are hence nonmembers of the Corey H. class) filed a motion to intervene in the Corey H. litigation. Their motion alleged that the ISBE had violated the IDEA, the 11th and 14th Amendments to the U.S. Constitution, and the Illinois Administrative Procedure Act when it promulgated both the certification rules and the transition rules. On August 15, 2001, the district court denied the Reid L. students' motion to intervene; on August 30, 2001, it denied the Reid L. teachers' motion to intervene. Appeal No. 01-3432 is from those orders of the district court.

Meanwhile, on June 4, 2001, the Reid L.

parties filed a separate action for declaratory and injunctive relief (No. 01 C 4180 in the district court). The complaint in the injunction action contained exactly the same allegations as the motion to intervene. The district court denied the Reid L. parties' request for a preliminary injunction and a temporary restraining order on June 28, 2001; Appeal No. 01-2707 in this court concerns that order. We consider first the Reid L. parties' arguments with respect to their motions to intervene; we then turn to their effort to obtain injunctive relief.

II

In remarks delivered in open court, the district court gave several reasons for denying the motions to intervene, either of right or permissively. First, he found that the Reid L. parties filed their motion too late: "the individual named intervenors . . . knew about the case for a long time. The case has been extensively publicized throughout the state. I can certainly take notice of that, because it all came out in the fairness hearing back in June of 1999, more than two years ago." Timing alone, the district court found, was "enough to deny the motion." In that connection, the court also noted the active role that the IEA was playing in the Reid L. effort and commented that had they tried to intervene back before all the work was done, they would have had a better argument. The court expressed concern for the finality of its order and found that to allow the proposed intervention would unravel results that had been reached since February of 1998, the date of its original decision on liability and its general injunction against the ISBE. At that early date, the court had identified the need for cross-categorical certification of special education teachers in order to comply with the IDEA and its "least restrictive environment" mandate.

In addition to these central concerns, the court also indicated that it did not believe that the proposed intervenors had shown that they had standing to sue, in that they were asserting only a generalized interest in a sound educational system. Next, it stated that the intervenors had failed to demonstrate that their interests had not been

adequately represented by an existing party, namely, the ISBE (which, the court noted, had opposed the Corey H. plaintiffs on the liability merits, and then opposed them at the remedies stage for a long time). Finally, the court found that the intervenors had failed to show that their rights or interests would be impaired by anything in the Corey H. settlement. Placement decisions for students would continue to be made on a child-by-child basis, pursuant to each child's individual education plan; and teachers had no interest in refusing to tailor their continuing educational training to the requirements of the new system, which ensured that no one would be decertified.

A.  Intervention of Right

There are four requirements for intervention of right under Fed. R. Civ. P. 24(a), in the absence of a statute giving an absolute right to intervene: (1) timeliness, (2) an interest relating to the subject matter of the main action, (3) at least potential impairment of that interest if the action is resolved without the intervenor, and (4) lack of adequate representation by existing parties. See Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd., 736 F.2d 384, 386 (7th Cir. 1984). The burden is on the party seeking to intervene of right to show that all four criteria are met. Keith v. Daley, 764 F.2d 1265, 1268 (7th Cir. 1985). If not, then the district court must deny intervention of right. See United States v. 36.96 Acres of Land, 754 F.2d 855, 858 (7th Cir. 1985).

Here, the principal ground on which the district court relied to deny the motion is expressly recognized by the Rule: timeliness. As it had long since entered its decree, the court relied on People Who Care v. Rockford Bd. of Ed., 68 F.3d 172 (7th Cir. 1995), to find that the presumption against intervention at that late date was sufficiently strong to defeat the effort of the Reid L. parties to do so. The Reid L. parties take exception to the court's characterization of them as latecomers to the event. They insist that they acted as soon as they realized that the certification rules were indeed going to be applied on a

state-wide basis and that the legislature would not be able to protect their interests. They point to February 17, 2001, as the critical date, because it was then that the district court ruled that the Illinois General Assembly could not nullify its remedial order. They also point out that the rules had not yet been implemented at the time of their intervention motion.

We see no flaw in the district court's conclusion that the Reid L. parties waited too long before attempting to intervene. Timeliness is fundamental not only to intervention, but to the overall conduct of a lawsuit, and it is a clearly spelled out requirement of Rule 24. "The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." Sokaogon Chippewa Community v. Babbitt, 214 F.3d 941, 949 (7th Cir. 2000) (internal quotations omitted). In order to decide whether a motion to intervene was timely, we look at factors like (1) the length of time the intervenor knew or should have known of her interest in the case, (2) the prejudice caused to the original parties by the delay, (3) the prejudice to the intervenor if the motion is denied, and (4) any other unusual circumstances. Ragsdale v. Turnock, 941 F.2d 501, 504 (7th Cir. 1991).

These motions were filed nine years after the Corey H. litigation began; more than two years after the district court's opinion finding the ISBE liable and singling out the state-wide teacher certification standards as a particular violation of the least restrictive environment rules; and more than ten months after the court approved the settlement agreement that formed the basis for the work leading up to the certification rules and the transition rules. These events provided ample notice to the Reid L. parties that their interests might be implicated in the ISBE's response to the court's orders. To the extent that they are arguing that the standard requires that their interests have been impaired beyond any remedy, they are wrong. Indeed, just as we rejected this kind of argument in Sokaogon Chippewa, we reject it here. See 214 F.3d at 949. The time to intervene was, at the very latest, when the

remedial process began, ten months before the actual motion. That was when the rules were being drafted and publicly discussed; that was when their input could have been received without undoing the long and difficult process that all other parties to this litigation had been pursuing in good faith. Even if we were to consider the ten months to be the only relevant delay, we could find no error in the district court's determination, as a decision about timeliness is reviewed for abuse of discretion. Vollmer v. Publishers Clearing House, 248 F.3d 698, 705-06 (7th Cir. 2001). The Supreme Court in N.A.A.C.P. v. New York, 413 U.S. 345 (1973) found that even a 17-day delay made the motion untimely as "it was incumbent upon the appellants, at that stage of the proceedings, (a critical stage) to take immediate affirmative steps to protect their interests." 413 U.S. at 367.

The district court's conclusion that the other parties to the litigation would suffer prejudice if the Reid L. parties were entitled to intervene is also well supported on this record. This case is close to completion, after a decade of litigation in the federal courts. If the Reid L. parties were allowed to enter now, everyone would be forced to return to Square One, with the same old certification rules in place, the same old problems under the IDEA, and no remedy in sight. The district court correctly noted that our decision in People Who Care strongly discourages such eleventh-hour measures. See also United States v. South Bend Community School Corp., 710 F.2d 394, 396 (7th Cir. 1983). This is true notwithstanding the fact that the Reid L. parties will be disadvantaged to the extent that they will have lost the chance to urge ISBE to implement a system more like the old one they are losing. But any such loss is of their own making; it is perfectly clear that they knew about this litigation and were content to participate on the sidelines for a long period of time. Theirs is not the kind of prejudice that should weigh in favor of a long-delayed motion for intervention. Since there are no other unusual circumstances counseling in favor of intervention, we conclude that the district court was justified in denying the motion on the ground of untimeliness.

Even assuming that untimeliness was not enough to bar the claim, intervention as of right would still not be appropriate. The Reid L. parties argue that they have asserted the kind of substantial interest in the new certification rules that would justify intervention, claiming that their interest is exactly the same as that of the Corey H. plaintiffs themselves: an interest in the most effective system for teaching children with disabilities consistent with the IDEA. At that level of generality, of course, they are correct. But the new element the teacher-intervenors seek to introduce into the case is more parochial: they wish to urge that the new rules will force them to change in ways that they regard as undesirable. The non-Chicago students among the Reid L. group wish only to argue that a different solution to the proven violation would have been preferable. The teachers' interest is far afield from the core concerns of the IDEA, which as we have already said are to assure the best appropriate education for students with disabilities in the least restrictive environment. As for the students, while they may have had a valid interest while the new rules were being drafted, now that the rules have been embodied in a decree the picture is different. Once the new rules are implemented, the violation of the IDEA should be redressed. At that point, the Reid L. students have merely a disagreement about pedagogical theory with the Corey H. plaintiffs. Such a vague concern is not enough to support intervention of right. Thus, at either a high or low level of generality, the Reid L. students' claim for intervention fails: if it is a general interest in Illinois's compliance with the IDEA, that is taken care of by all the parties in the Corey H. litigation already; if they are concerned only with the specifics of the new certification rules, they have no independent interest in the details of their teachers' certification, once the remedial order brings such certification in compliance with federal law.

We also see no independent interest the Reid L. intervenors can assert in the specific procedures that were used to develop the new rules; it is plain on the face of this record that extensive notice, opportunity to comment, and

review were involved, and we see nothing in the IDEA that requires more.

Next, we agree with the district court that the Reid L. students have not shown how their interest in the least restrictive educational environment has been impaired by the new rules. As the court noted, each pupil will still be en titled to have an individualized education plan developed for him or her; school districts will continue to have an obligation to provide qualified personnel to teach those students (or to place them elsewhere if that cannot be done); and students will still be able to take advantage of the procedural protections afforded by the statute if they or their parents believe that the program is falling short.

Finally, we consider whether the district court correctly found that the legally cognizable interests of the Reid L. proposed intervenors were adequately represented by the existing parties to the case. See People Who Care, 68 F.3d at 177. Insofar as the students had an interest in proving a violation of the federal statute, it is clear that the Corey H. parties represented them very well--so much so that a major problem of noncompliance with federal law has been redressed. Insofar as the students had an interest in having the court adopt an effective remedy for that violation-- another thing that was accomplished--it is also true that numerous points of view were aired before ISBE and the court settled on the final remedial measures. The mere fact that no student from downstate Illinois was formally entitled to party status does not mean that the court was unexposed to arguments about the virtues of more categorical certification standards, or fewer such standards. As the district court pointed out, for much of this litigation ISBE, a governmental body, was opposing the Corey H. plaintiffs in much the same way one would have expected the Reid L. proposed intervenors to behave. See generally United States v. South Bend Community School Corp., 692 F.2d 623, 625 (7th Cir. 1982); Keith v. Daley, 764 F.2d at 1270 ("Adequacy can be presumed when the party on whose behalf the applicant seeks intervention is a governmental body or officer charged by law with representing the interests of the proposed

intervenor.").

But, the Reid L. parties respond, at this point in the litigation ISBE is trying to defend the new rules that itauthored itself, and then allowed to take effect over the express opposition of the JCAR and the Illinois General Assembly. The latter point, however, is a red herring; the district court properly found that the state authorities did not have the power to override an injunctive decree issued by a federal court to remedy a state's violation of standards established by federal law. Were it otherwise, we would risk a return to the unlamented period when states asserted the right to interpose their laws against unpopular federal civil rights decrees, see Cooper v. Aaron, 358 U.S. 1 (1958), a period that has long been put to rest throughout the country. A remedial order "can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them," id. at 17. As for the former point, it is just another way of arguing that the Reid L. parties should be entitled to attack the present rules in the capacity as intervening parties to the Corey H. litigation, even though their motion was untimely. The problem with this argument is its ex post perspective. The ISBE represented their interests vigorously in its opposition to Corey H.: its being sensible enough to enter into a consent decree in no way left the Reid L. parties unrepresented, and the ISBE is entitled to defend the rules it drafted. Everyone must now comply with the rules the ISBE itself has chosen to enact, under the spur of the liability finding, until such time as a new opportunity for public input on revised rules arises or until the court chooses to terminate the decree.


B.  Permissive Intervention

The court denied the motions for permissive intervention for the same reasons it denied the motions for intervention of right. With respect to permissive intervention, however, our review is more deferential. "Reversal of a district court's denial of permissive intervention is a very rare bird indeed, so seldom seen as to be considered

unique." Shea v. Angulo, 19 F.3d 343, 346 n.2 (7th Cir. 1994). Once again, the untimely nature of the requests, the prejudice that the existing parties to the case would suffer, and the questionable nature of the legal injuries the proposed intervenors would suffer, all combine to demonstrate that the district court did not abuse its discretion in denying this part of the motions.

III

The Reid L. parties pursued an alternative avenue of attack on the new teacher certification rules and the transition system before it took effect by filing a separate suit for declaratory and injunctive relief. We have jurisdiction to review the district court's denial of preliminary injunctive relief. 28 U.S.C. sec. 1292(a)(1).

A party seeking to obtain a preliminary injunction must demonstrate a likelihood of success on the merits, a lack of an adequate remedy at law, and a future irreparable harm if the injunction is not granted. See Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992). Once the court is satisfied that these three conditions have been met, it must consider the harm that the nonmoving party will suffer if the injunction is granted, balancing it against the irreparable harm to the moving party from the denial of relief. See Storck USA, L.P. v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court must consider the interest of and harm to nonparties from a denial or grant the injunction. Id.

The district court explained in its order denying the preliminary injunction that it was doing so for several reasons: the Reid L. parties had failed to exercise due diligence in bringing the motion; they lacked standing to attack the rulings in the Corey H. case; they were not likely to succeed on the merits of their claims; and finally, it found that the harms foreseeable to them if the injunction were denied were less than the harms that the Corey H. parties would suffer were the injunction granted. In reviewing the denial of a preliminary injunction, this court adopts a deferential stance: we review any

findings of fact the district court made for clear error, and we review its balancing of the considerations for or against an injunction for abuse of discretion. United Airlines, Inc. v. International Ass'n of Machinist and Aerospace Workers, AFL-CIO, 243 F.3d 349, 360 (7th Cir. 2001).

The principal substantive claim the Reid L. parties are asserting is that the ISBE harmed them by not conducting formal public hearings before it implemented the new certification rules--something they believe can be redressed under 42 U.S.C. sec. 1983. They find the source of the public hearing requirement in the IDEA, under which state agencies must conduct such public hearings as a prerequisite for their eligibility for federal funding under the Act. 20 U.S.C. sec. 1412(a)(20). Not having the appropriate hearings, they contend, is the requisite predicate violation of federal law. Notably, the section says nothing about the right of either schoolchildren or their teachers to compel anyone to hold such hearings; it merely creates a precondition for the state to receive funds. Without such a right, any sec. 1983 claim is a nonstarter.

Under the Illinois Administrative Procedure Act, there is also a requirement for notice and an opportunity to comment. From a technical standpoint, it is true that the new certification rules were promulgated without the required notice, in apparent violation of 5 ILCS 100/5-40. But for several reasons, the violation is only apparent. First, as the Monitor had suggested, the rules were promulgated under the alternative statutory authority to issue peremptory rules, found in 5 ILCS 100/5-50. The rules were later suspended by the JCAR in any event, which meant that the new rules had been prevented from going into effect as a matter of state law. But it was then that the federal court stepped in and mooted any point about compliance with state administrative procedures. Rather than using these procedures, the court simply ordered on February 27, 2001, that the rules were to go into effect. Since the court could have simply drafted a complete remedial decree on its own, without any assistance at all from the ISBE or Illinois administrative procedure rules, we see no ground for basing a

federal lawsuit on an alleged failure to follow state law. See, e.g., Kirkland v. New York State Dept. of Correctional Servs., 628 F.2d 796, 801 (2d Cir. 1980) (once a violation of federal law is found, the power of the district court to fashion a remedy arises as a matter of federal law, and nonconformance with state law is immaterial).

Furthermore, as was noted above, there was extensive public input into the development of these rules, which assured from a practical standpoint that the purposes of notice and comment requirements were fulfilled.

The district court also thought that the Reid L. parties neither had standing to sue nor a private right of action to enforce the public hearing provisions of the statute. We need not resolve this issue definitively, as we are satisfied that the court did not abuse its discretion in denying the injunction. But we confess to serious doubts about the standing of the teacher-plaintiffs. It is hard to see what legally protected interest of theirs has been invaded and how the invasion has injured them. No teacher will be decertified because of the new certification standards or the transition rules; teachers will be able to qualify for the new LBS1 certificate over a three-year period, through their ordinary continuing education process; and in the meantime teachers may not be forced to teach in areas for which they are unprepared. We would have just as little sympathy if an attorney complained that her law license was impaired because the state bar toughened its continuing legal education or bar membership requirements. See, e.g., Brown v. McGarr, 774 F.2d 777 (7th Cir. 1985). One has no legally protectible interest in taking easy classes rather than hard ones. Thus, it appears that the teachers lack standing to participate in the present case. As for the Reid L. students, once the Corey H. plaintiffs obtained relief that redressed the statutory violation, any injury they may have had has already been redressed. It is hard to imagine any abstract interest the students might have in the kinds of hearings on proposed rule changes that took place in the past that would qualify under familiar federal standing rules. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

But, as noted before, we do not need to resolve this definitively for purposes of ruling on a preliminary injunction denial; it is enough to say that there is only a small likelihood of success on the merits on this point.

We are equally dubious about whether 20 U.S.C. sec. 1412(a)(20) confers a private right of action on either the teachers or the students. In the past, sec. 1415 actions have been brought only to redress individual denials of appropriate care to a child, not for failures to comply with hearing and notice requirements for broader rule-making exercises. As the appellees note, in Alexander v. Sandoval, 532 U.S. 275 (2001), the Supreme Court held that no implication of a private right of action should be read into a statute that merely sets forth requirements that an entity must meet in order to receive federal funds. Id. at 290. It seems that this is all that sec. 1412(a)(20) does.

When, prior to the oral argument on the denial of intervention, the preliminary injunction appeal was argued to this court, the Reid L. parties also urged that it was unfair to foreclose any method of participation for them: if they could not intervene (as the district court had held by then), then they must be able to bring an independent action; if they could not sue separately, then intervention must be an option. But our reasons for rejecting intervention do not imply that a timely motion to participate in the case would or should have been denied, and nothing the district court said leads us to believe that it would have frowned on such an effort. Rights can be lost, and that one was. That does not mean that the district court was required to permit exactly the same kind of disruption under the guise of a free-standing action for injunctive relief.Under the present circumstances, the denial of both avenues is perfectly legitimate, given that the parties did not make the requisite showing under either one.

To prevail on the merits of their request for a permanent injunction, the Reid L. parties would have to convince the court that the remedy it has just ordered for the IDEA violations it found in 1998 is itself a separate violation of

the statute. The district court reasonably evaluated as slim their likelihood of success on that claim, even assuming they could surmount the standing problem. This is not because children outside the class certified in Corey H. are bound as parties to that outcome, on some sort of virtual representation theory. They are not. But the procedural arguments based on the IDEA and state law are weak, and as a substantive matter it will be hard for them to show that the remedy the court has adopted, with ISBE's input, is not at least one of the solutions to the violation that was acceptable. It need not be the only one, or even the best one, as long as it remedies the violation in a properly tai lored way and respects the law otherwise, both of which it fulfills.

IV

In No. 01-3432, we AFFIRM the orders of the district court denying the motions to intervene of the Reid L. parties. In No. 01-2707, we AFFIRM the district court's denial of the Reid L. parties' motion for a preliminary injunction. The district court is free to proceed with any matters still before it in a manner consistent with this opinion.